Argued and submitted July 22, affirmed November 6, 2003

In the Matter of the Application for
a Site Certificate for Northwest Natural Gas
Company's South Mist Pipeline Extension,

FRIENDS OF PARRETT MOUNTAIN,
Larry Briggs, Leann Bennett, and George Burns,
*Petitioners,*

*v.*

NORTHWEST NATURAL GAS COMPANY,
*Respondent.*

(SC S50428 (Control))

WASHINGTON COUNTY FARM BUREAU,
Clackamas County Farm Bureau,
Marion County Farm Bureau,
David Vanasche, Philip Lapp, Stacey Rumgay Button,
LKS Corporation,
dba Wil-Chris Acres,
Doug Femrite, Femrite Nursery Company,
Stephen G. Baker, and Clive Cook,
*Petitioners,*

*v.*

ENERGY FACILITY SITING COUNCIL,
*Respondent.*

(SC S50434)

79 P3d 869

James S. Smith, of Davis Wright Tremaine, LLP, Portland, argued the cause and filed the brief for petitioners Friends of Parrett Mountain, Larry Briggs, Leann Bennett, and George Burns.

Christine M. Cook, Portland, argued the cause for petitioners Washington County Farm Bureau, Clackamas County Farm Bureau, Marion County Farm Bureau, David Vanaschc, Philip Lapp, Stacey Rumgay Button, LKS Corporation, Doug Femrite, Femrite Nursery Company, Stephen G. Baker, and Clive Cook. With her on the brief was F. Blair Batson, Portland.

James N. Westwood, Stoel Rives LLP, Portland, argued the cause for respondent Northwest Natural Gas Company. With him on the brief were Margaret D. Kirkpatrick and Ellen Hawes Grover, Portland.

Denise G. Fjordbeck, Assistant Attorney General, Salem, argued the case for respondent Energy Facility Siting Council. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Carson, Chief Justice, and Gillette, Durham, Riggs, De Muniz, and Balmer, Justices.**

DE MUNIZ, J.

---

** Kistler, J., did not participate in the consideration or decision of this case.

## DE MUNIZ, J.

In these consolidated proceedings for judicial review, petitioners challenge a final order of the Energy Facility Siting Council (council) that permits Northwest Natural Gas Company (Northwest Natural) to construct an approximately 62-mile long natural gas pipeline sited primarily within Exclusive Farm Use (EFU) zones in Washington, Marion, and Clackamas counties. This court reviews final orders of the council for errors of law, abuses of agency discretion, and the presence of substantial evidence in the record to support the agency's findings of fact. ORS 469.403(6); ORS 183.482(8)(a). In the cases before us, the parties raise issues that require review for legal error and substantial evidence only. For the reasons that follow, we affirm the council's order.

## FACTS, PROCEDURAL BACKGROUND, AND STATUTORY FRAMEWORK

At the heart of these contested cases is the council's decision to issue a site certificate for a new, 24-inch wide, underground natural gas pipeline that will link Northwest Natural's Bacona Station in Washington County with its Molalla Gate Station in Clackamas County.[1] A site certificate not only authorizes an applicant to construct and operate a facility like the pipeline at issue here,[2] it also binds state, county, and city governments in accordance with the council's determination and requires state agencies and local governments to issue any permits specified in the site certificate without further proceedings. ORS 469.401. We begin our discussion of these cases by first providing an overview of the procedures involved in the council's determinations

---

[1] The stated purpose of the pipeline is twofold. First, according to Northwest Natural, it will allow Northwest Natural to maximize use of its Mist Underground Natural Gas Storage Facility to store gas during off-peak periods of demand and help balance a relatively static gas supply with widely fluctuating seasonal needs. Second, it will help meet the increasing demands for natural gas in the growing suburbs west of Portland.

[2] Aside from several exceptions not relevant here, ORS 469.300(10)(a)(E) defines natural gas pipelines that are at least 16 inches in diameter and more than five miles long as energy facilities.

generally, followed by a procedural history of these cases in particular.

ORS 469.470(1) places the responsibility for studying each aspect of site selection with the council:

"The Energy Facility Siting Council shall:

"(1) Conduct and prepare, independently or in cooperation with others, studies, investigations, research and programs relating to *all aspects of site selection*."

(Emphasis added.) To aid the council in performing that function, ORS 469.040(1)(b) requires the administrator of the Oregon Office of Energy (OOE) to supervise and facilitate work and research on siting applications at the council's direction.

Because of the council's central role in siting determinations, applicants begin the process by submitting a Notice of Intent (NOI) to the council, outlining the proposed site and the characteristics of the proposed facility. ORS 469.330(1). The council, in turn, distributes public notice of the applicant's intent, describing the proposed facility and its site in sufficient detail to inform the public of the facility's use and its location. ORS 469.330(2). After reviewing the NOI, as well as any comments generated by its public distribution, the OOE may hold a preapplication conference with those state agencies and local governments that would have a regulatory or advisory responsibility regarding the proposed facility. ORS 469.330(3). Following that conference, the OOE issues a project order that establishes the applicable statutes, administrative rules, council standards, local ordinances, application requirements, and study requirements governing the application process. *Id.* A project order is not a final order, and either the council or the OOE may amend it at any time. ORS 469.330(4).

When an applicant has completed the project order's requirements, the applicant must submit its application to the council. ORS 469.350(1). The applicant's NOI and application then are distributed to various state agencies, as well as any city or county affected by the application, for comments and recommendations. ORS 469.350(2). It is the OOE's responsibility to determine whether the application is

complete and, when it does so, to notify both the applicant and the public. ORS 469.350(4).

The OOE reviews the completed application, along with the comments and recommendations submitted by state agencies and local governments. Following that review, the OOE prepares a draft proposed order. ORS 469.370(1). After the OOE issues its draft, the council must hold one or more public hearings on the application in areas that the proposed facility will affect and elsewhere, when the council considers it necessary. ORS 469.370(2). The OOE reviews any testimony taken at those hearings and then issues a proposed order recommending approval or rejection of the application. ORS 469.370(4). The OOE also must issue a public notice concerning the proposed order; the notice must include notice of a contested case hearing, along with deadlines for requesting party status in that proceeding and a date for the prehearing conference. *Id.*

After the council receives the OOE's proposed order regarding the application, the council must hold a contested case hearing in accordance with the provisions of ORS 183.310 to 183.550. ORS 469.370(5). At the conclusion of the contested case, the council issues its final order either approving or rejecting the application. ORS 469.370(7).

In 1999, Northwest Natural introduced its pipeline proposal by first submitting its NOI to the council. Northwest Natural then distributed the NOI to the appropriate state agencies, the Confederated Tribes of the Grande Ronde and Siletz, local governing bodies, and individual property owners in areas likely to be affected by the pipeline's construction.

In its NOI, Northwest Natural defined an area encompassing roughly 500 square miles for the study of prospective pipeline sites.[3] It then laid out four possible corridors within that area as starting points for analysis and public comment. The OOE subsequently directed Northwest

---

[3] That area was bounded roughly by the Columbia/Washington county line to the north, Molalla to the south, the Coast Range to the west, and a line approximating the eastern limits of Hillsboro, Sherwood, Wilsonville, and Canby to the east.

Natural to develop and study three additional alternatives: (1) a route that followed the area's major highways—US 26, US 17, and Interstate 5;[4] (2) a route that considered only the factors listed in ORS 215.275(2);[5] and (3) a route that minimized incursions onto EFU-zoned lands. When those studies were completed, Northwest Natural began formulating preferred and alternative pipeline sites for review, using public comments received in response to its NOI and data derived from its research.

Under ORS 469.310, "siting, construction and operation of energy facilities shall be accomplished in a manner consistent with protection of the public health and safety and in compliance with the energy policy and air, water, solid waste, land use and other environmental protection policies of this state." The different sets of requirements implementing that statute are extensive.[6] This case involves two sets of

---

[4] That route represented the alternative most often mentioned in public responses to Northwest Natural's NOI.

[5] ORS 215.275(2) is set out in full below, 336 Or at 100. Briefly paraphrased here for convenience, that statute allows an applicant to site an energy facility in an EFU zone if the applicant must use that zone rather than other alternatives due to one of the following factors: (1) technical and engineering feasibility; (2) locational dependency; (3) lack of available urban and nonresource lands; (4) availability of existing rights-of-way; (5) public health and safety; and (6) other requirements of state and federal agencies.

[6] OAR chapter 345, division 22, for example, delineates many of the substantive standards that an applicant must meet to receive site certification from the council. As a threshold matter, an applicant must, through appropriate studies, first categorize the site as to seismic zone and expected ground motion, show that the facility can be designed and built to avoid those dangers, and identify and avoid adverse nonseismic effects that construction will have on the site, OAR 345-022-0020. The applicant then must demonstrate, generally, that the design, construction, operation, and retirement of a facility (1) can avoid adverse soil impacts, OAR 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; (2) will comply with statewide planning goals adopted by the Land Conservation and Development Commission (LCDC), OAR 345-022-0030; (3) are not likely to result in significant adverse impacts to protected areas, OAR 345-022-0040; (4) will allow a site to be restored adequately to a useful, nonhazardous condition following permanent cessation of construction or operation of the facility, OAR 345-022-0050; (5) are consistent with fish and wildlife habitat mitigation goals and standards, OAR 345-022-0060; (6) are consistent with conservation and protection programs for endangered plant and animal species, OAR 345-022-0070; (7) are not likely to result in significant adverse impacts to important scenic and aesthetic values identified in applicable land management plans, OAR 345-022-0080; (8) are not likely to result in significant adverse impacts to historic, cultural, or archaeological resources listed on, or likely to be listed on, the National Register of Historic Places, OAR 345-022-0090; (9) are not likely to result in significant adverse impacts to important recreational opportunities, OAR 345-022-0100; (10) are not likely to result in significant adverse impacts to the ability of public

requirements in particular. The first set of requirements encompasses the statutory criteria that an applicant must meet to locate energy facilities on EFU lands. ORS 215.275 requires an applicant, as a threshold matter, to demonstrate that it has considered reasonable alternatives to placing its facility within an EFU zone. The statute then requires the applicant to show that it nevertheless must site its facilities in an EFU zone due to one or more statutory factors:

"(1) A utility facility established under ORS 215.213(1)(d) or 215.283(1)(d) is necessary for public service if the facility must be sited in an exclusive farm use zone in order to provide the service.

"(2) To demonstrate that a utility facility is necessary, an applicant for approval under ORS 215.213(1)(d) or 215.283(1)(d) must show that reasonable alternatives have been considered and that the facility must be sited in an exclusive farm use zone due to one or more of the following factors:

"(a) Technical and engineering feasibility;

"(b) The proposed facility is locationally dependent. A utility facility is locationally dependent if it must cross land in one or more areas zoned for exclusive farm use in order to achieve a reasonably direct route or to meet unique geographical needs that cannot be satisfied on other lands;

"(c) Lack of available urban and nonresource lands;

"(d) Availability of existing rights of way;

"(e) Public health and safety; and

"(f) Other requirements of state or federal agencies.

"(3) Costs associated with any of the factors listed in subsection (2) of this section may be considered, but cost alone may not be the only consideration in determining that a utility facility is necessary for public service. Land costs shall not be included when considering alternative locations for substantially similar utility facilities. The Land

_____

and private entities to provide sewers and sewage treatment, water, storm water drainage, solid waste management, housing, traffic safety, police and fire protection, health care, and schools, OAR 345-022-0110; and (11) will minimize and recycle solid waste and wastewater with minimal adverse impacts on surrounding and adjacent areas, OAR 345-022-0120.

Conservation and Development Commission shall determine by rule how land costs may be considered when evaluating the siting of utility facilities that are not substantially similar.

"(4)   The owner of a utility facility approved under ORS 215.213(1)(d) or 215.283(1)(d) shall be responsible for restoring, as nearly as possible, to its former condition any agricultural land and associated improvements that are damaged or otherwise disturbed by the siting, maintenance, repair or reconstruction of the facility. Nothing in this section shall prevent the owner of the utility facility from requiring a bond or other security from a contractor or otherwise imposing on a contractor the responsibility for restoration.

"(5)   The governing body of the county or its designee shall impose clear and objective conditions on an application for utility facility siting under ORS 215.213(1)(d) or 215.283(1)(d) to mitigate and minimize the impacts of the proposed facility, if any, on surrounding lands devoted to farm use in order to prevent a significant change in accepted farm practices or a significant increase in the cost of farm practices on the surrounding farmlands.

"(6)   The provisions of subsections (2) to (5) of this section do not apply to interstate natural gas pipelines and associated facilities authorized by and subject to regulation by the Federal Energy Regulatory Commission."

ORS 215.275.

The second set of requirements is found in the structural standards imposed by OAR 345-022-0020(1). Under that rule, an applicant seeking site certification must demonstrate that:

"(a)   The applicant, through appropriate site-specific study, has adequately characterized the site as to seismic zone and expected ground motion and ground failure, taking into account amplification, during the maximum credible and maximum probable seismic events; and

"(b)   The applicant can design, engineer, and construct the facility to avoid dangers to human safety presented by seismic hazards affecting the site that are expected to result from all maximum probable seismic events. As used

in this rule 'seismic hazard' includes ground shaking, land-slide, liquefaction, lateral spreading, tsunami inundation, fault displacement, and subsidence;

"(c) The applicant, through appropriate site-specific study, has adequately characterized the potential geological and soils hazards of the site and its vicinity that could, in the absence of a seismic event, adversely affect, or be aggravated by, the construction and operation of the proposed facility; and

"(d) The applicant can design, engineer and construct the facility to avoid dangers to human safety presented by the hazards identified in subsection (c)."

In March 2001, Northwest Natural presented its siting plan to the OOE in an eight-volume site certificate application. At the OOE's direction, Northwest Natural subsequently submitted several supplements to complete the application, among them detailed plans to mitigate possible environmental and agricultural impacts. In September 2002, the OOE issued a proposed order tentatively approving the pipeline's site certificate. At the same time, the OOE also issued a contested case proceeding notice to allow interested parties to challenge the proposed order. Ultimately, the council granted party status to 56 entities and individuals in the administrative proceedings that followed. From December 13, 2002 through January 31, 2003, the parties presented their respective cases. The council then issued a recommended order in February 2003, and the parties filed exceptions and responses. In March 2003, the council issued a final order granting a site certificate for construction of the pipeline.

The certificate authorizes Northwest Natural to construct its pipeline within an approximately 62-mile long, 200-foot wide corridor designed around 10 significant "constraint points."[7] Inside that corridor, Northwest Natural will build

---

[7] In laying out the corridor, Northwest Natural identified 10 key locations that the proposed facility had to pass through, or had to avoid, to maintain its viability. Those "constraint points" were formulated based on a variety of factors: public safety, geotechnical or engineering matters, other state or federal requirements, specific council requirements, and the location of favorably aligned roads. In each case, Northwest Natural considered alternatives to those locations, but found either that it could not implement them due to one of the constraint point factors listed above or that the proposed alternative simply traded one EFU location for another.

the pipeline within an 80-foot wide, temporary construction easement. Upon completion of the project, the width of the easement will be reduced to 40 feet and become permanent. Approximately 56 miles of the pipeline will pass through EFU zones; in those zones, 35 miles of the pipeline will be buried within, or adjacent to, existing road or highway rights-of-way. In most locations, the pipeline will be buried at least five feet below ground level, except at road crossings, where the pipeline's depth will be four feet.

Two groups of petitioners seek review of the council's siting decision in this case. The first—Friends of Parrett Mountain *et al.* (Parrett Mountain petitioners)—is a community organization comprised of people from the Parrett Mountain and Sherwood areas who live or work in the vicinity of the proposed pipeline. The second—Washington County Farm Bureau *et al.* (Farm Bureau petitioners)—is made up of the Washington County Farm Bureau, its counterparts in Marion and Clackamas counties, and individual farm owners who will be affected by the pipeline's construction. We address the arguments of each group separately.

## PARRETT MOUNTAIN PETITIONERS

In the proceedings below, the Sherwood fault—a geological formation underlying the pipeline's proposed route in the Parrett Mountain area—was of particular concern for Parrett Mountain petitioners, because of the possible earthquake activity often associated with faults. The council found, however, that Northwest Natural's application met the structural standards imposed by OAR 345-022-0020(1) and demonstrated that Northwest Natural could design, engineer, and construct the pipeline to avoid seismic and soil-related dangers to human safety. On review, Parrett Mountain petitioners argue that substantial evidence in the record does not support the council's finding.

To understand petitioners' argument fully, some explanation regarding the geological assessment of the Parrett Mountain/Sherwood area is needed. OAR 345-021-0010(1)(h) required Northwest Natural to submit, with its application, "information from reasonably available sources regarding the geological and soil stability of the site and

vicinity." To comply with that requirement, Northwest Natural hired an independent engineering firm to compile a geological assessment of the proposed pipeline corridor.

In examining the Parrett Mountain portion of the corridor, the firm conducted, among other things, an aerial study of the region's topography, searching for potential landslide hazards with digital sonar technology and aerial photography. Field investigations of areas identified as potential trouble spots followed the aerial study. The engineering firm also relied, in part, on a 1995 study that had examined the Sherwood fault for earthquake potential and found no evidence that the fault had moved in the last 1.6 to 2 million years. In addition, the firm used its own aerial photographs to determine that soil deposits covering the surface projection of the fault from past geologic ages had remained undisturbed for roughly ten thousand years. As a result of its studies, the engineering firm concluded that the fault should not be considered potentially active and that the pipeline was unlikely to be threatened by landslides in the area.

Parrett Mountain petitioners, however, also engaged an independent expert—a certified geologist—to review geotechnical data from the area and physically examine the proposed pipeline site. Upon completing his research, the geologist testified that Northwest Natural had failed to (1) use or refer to the best and most detailed study of the local geology; (2) identify two significant landslides in the middle of the corridor that should be of concern to the pipeline designers; and (3) address the considerable evidence of "soil creep" in the area.[8]

In response, a representative of Northwest Natural's engineering firm testified that his firm had not used the study referred to by the Parrett Mountain geologist—*Groundwater Conditions of Basalt Aquifers, Parrett Mountain, Northern Willamette Valley*—because of its focus on groundwater resources rather than fault hazards. The engineering firm nevertheless reviewed the groundwater

---

[8] "Soil creep" is the gradual movement of soil down a slope in response to gravity. When it occurs at a level deep enough below the surface, soil creep can result in step-like ridges along hillsides, trees that grow in a curve to counteract progressive leaning, and severely tilted man-made structures.

study, and its representative later presented evidence documenting multiple discrepancies in the study's geological mapping. As a result, the engineering firm's representative concluded that the study's geological map and associated cross sections did not meet generally accepted standards of quality for published maps, calling the map's reliability into question. The engineering firm's representative also noted that, in any event, the ground water study presented nothing to indicate that the Sherwood fault, in fact, was active.

Northwest Natural's engineering firm also returned to the Parrett Mountain area to investigate the landslide sites and soil creep reported by the Parrett Mountain geologist. The engineering firm found no evidence of landslide activity at the locations that the Parrett Mountain expert had noted. The firm also concluded that slope irregularities in the area were generally not the product of soil creep, but rather traces of old logging activities—the remains of access roads, dragline scars, and removed or rotted stumps. Although the firm did discover some instances of soil creep, the firm found that the affected areas were shallow and unlikely to disturb the pipeline because of the depth at which it would be buried.

On review, Parrett Mountain petitioners argue that, to the extent that their expert's evidence conflicts with evidence presented by Northwest Natural's experts, unfilled gaps exist in the demonstration of Northwest Natural's ability to meet the structural standards imposed by OAR 345-022-0020(1). Because of those gaps, they argue, this court should conclude that the council's final order is not supported by substantial evidence in the record. We disagree.

Substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding. ORS 183.482(8)(c). In making that determination, the probative weight to be accorded the testimony of expert witnesses is for the trier of fact to apportion. *Cf. State v. Clark*, 286 Or 33, 40-41, 593 P2d 123 (1979) (stating principle in nonadministrative law context).

■    Here, in arguing that the parties' clash of experts effectively has deprived the record of substantial evidence,

Parrett Mountain petitioners implicitly ask this court to either weigh the evidence in the record, reexamine the credibility of the experts, or both. That is not our function in this case. Although the testimony of the respective experts is in conflict, a simple conflict in evidence is not a sufficient basis for this court to conclude that the council's findings regarding OAR 345-022-0020(1) are unsupported by substantial evidence.

■     In any event, even if we were to assume, without deciding, that the Parrett Mountain expert indeed did create an "evidentiary gap" in the record when he testified before the council, we could not say the same after Northwest Natural's expert responded. Neither Northwest Natural's engineering firm nor the council dismissed out of hand the concerns contained in the Parrett Mountain expert's testimony—the unused groundwater study, the undiscovered landslide sites, and soil creep in the area. The record shows that Northwest Natural's experts reviewed the groundwater study, physically reexamined the area proposed for locating the pipeline, and subsequently presented evidence garnered from those endeavors to rebut the geologist's testimony. Based on that evidence and the engineering firm's initial studies of the area, the council ultimately determined that the firm's presentation regarding the safety of the pipeline's Parrett Mountain location was entitled to greater weight than the countervailing evidence presented by petitioners' geologist. That determination was within the purview of the council, and the evidence from which it was drawn would permit a reasonable person to make the same findings as those contained in the council's order. We therefore conclude that there was substantial evidence in the record that Northwest Natural's site certificate application met the structural standards imposed by OAR 345-022-0020(1).

## FARM BUREAU PETITIONERS

The issues that Farm Bureau petitioners raise on review are the result of the pipeline's proposed placement in areas zoned for exclusive farm use. In its final order, the council found that Northwest Natural—in keeping with ORS 215.275—had considered reasonable alternatives to EFU locations in formulating the pipeline's route. The council then

found that siting the pipeline within EFU zones nevertheless was necessary in light of the statutory factors set out in ORS 215.275(2).

As set out above, 336 Or at 100, before an applicant can site an energy facility in an EFU zone, ORS 215.275(2) requires the applicant to establish that it *must* site the facility in that zone to provide service. To do so, that statute requires an applicant to show that, as part of its planning, it considered reasonable alternatives to the use of EFU lands and that one or more statutory factors nevertheless required it to locate the facility in an EFU zone. *See* 336 Or at 99 n 5.

On review, Farm Bureau petitioners' first assignment of error is that the council misconstrued ORS 215.275(2) in finding that Northwest Natural had considered "reasonable alternatives" before concluding that it was necessary to locate the pipeline within EFU zones. Specifically, Farm Bureau petitioners argue that, as a matter of law, the phrase "reasonable alternatives" means alternatives that are "facially feasible" or, as they state in their brief, "alternatives that have some likelihood of success either initially or with modest refinement." They contend that Northwest Natural failed to meet that standard.

This court interprets statutory terms under the now familiar analytical framework set out in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). Pursuant to that methodology, we first examine the text and context of the statute, giving words of common usage "their plain, natural, and ordinary meaning." *Id.* at 611. If the legislature's intent is clear from the text and context of the statute, then further analysis is unnecessary. *Id.*

■    No statutory definition exists to explain what makes an alternative "reasonable" under ORS 215.275(2). There is, however, a well-understood legal meaning attributed to that term: "Fair, proper, just, moderate, suitable under the circumstances. * * * Not immoderate or excessive, being synonymous with rational, honest, equitable, fair, suitable, moderate, tolerable." *Black's Law Dictionary* 1265 (6th ed 1990). That definition of "reasonable" contrasts considerably with the meaning that Farm Bureau petitioners would have us insert in its place, *i.e.*, to "have some likelihood of success

either initially or with modest refinement." By its choice of words, the legislature used a broad brush to describe the alternatives that an applicant must consider under ORS 215.275(2). The qualification that Farm Bureau petitioners propose would narrow that broad standard significantly, effectively replacing it with one by which applicants must determine that a particular EFU alternative probably is capable of realization before they can consider it as an alternative under the statute. We reject that construction of the statute. *See* ORS 174.010 (in construing statutes, court cannot omit what has been inserted or insert what has been omitted).

Farm Bureau petitioners next argue that, in developing the initial pipeline corridor, the council erred in failing to require Northwest Natural to evaluate siting alternatives on a property-by-property basis. Relying on a Land Use Board of Appeals' (LUBA) decision *City of Albany v. Linn County*, 40 Or LUBA 38 (2001), they contend that the size and complexity of the proposed pipeline requires a property-by-property analysis under ORS 215.275(2) for each discrete property segment. That position, however, is not well supported, for several reasons.

First, nothing in ORS 215.275(2) suggests that the legislature intended to impose the kind of property-by-property analysis Farm Bureau petitioners posit here. The text of that statute focuses on EFU zones only as whole units, not as collections of discrete, subdivided properties:

> "To demonstrate that a utility facility is necessary, an applicant for approval under ORS 215.213(1)(d) or 215.283(1)(d) must show that reasonable alternatives have been considered and that the facility must be sited *in an exclusive farm use zone*[.]"

(Emphasis added.)

Second, assuming *arguendo* that LUBA's opinion in *City of Albany* is indeed instructive in the context of this judicial review proceeding, Farm Bureau petitioners nevertheless have misconstrued its application here. *City of Albany* involved siting a municipal waterworks that encompassed

separate, discrete components, among them, a water treatment facility, a storage reservoir, a waste backwash facility, and finished water pipelines. The opinion in that case noted, as a general matter, that the need to locate one component of such a facility in an EFU zone would not necessarily justify siting companion components in the same zone. 40 Or LUBA at 48. The opinion then went on to observe that the justification for siting the waterworks' pipelines on farm or forest land would not, by extension, also justify placing the facility's separate water treatment and storage reservoir components in similar areas. *Id.* at 50.

The kind of multiple-component utility that figured so prominently in *City of Albany*, however, is not present in this case. Here, one component comprises the facility at issue: the proposed pipeline. Unlike the waterworks in *City of Albany*, the pipeline contains no obvious dividing points marked by separate physical structures and therefore affords no occasion to consider whether distinct physical structures might require distinct justifications under ORS 215.275(2). As a result, we see no application for the *City of Albany* rationale in this case. The council did not err in refusing to require a property-by-property analysis of the pipeline under ORS 215.275(2).

In their second and third assignments of error, Farm Bureau petitioners focus on the use of road and highway rights-of-way in the EFU zones as alternatives to routing the pipeline through actively farmed land. Farm Bureau petitioners assert in their second assignment of error that the council erred when it allowed Northwest Natural to site the pipeline on farmland, rather than in public road and highway rights-of-way within the EFU zones. Specifically, they argue that the council misconstrued ORS 215.275(2) and made findings that were not supported by substantial evidence in determining that safety and other concerns prevented Northwest Natural from locating the pipeline within those rights-of-way. In their third assignment of error, Farm Bureau petitioners assert that the council erred when it determined that road or highway rights-of-way in EFU zones do not require consideration as siting alternatives under

ORS 215.275(2). Farm Bureau petitioners note that, pursuant to ORS 215.283(1)(L), an applicant may site energy facilities either overhead or in the subsurface of public roads in EFU zones without resorting to the analysis required by ORS 215.275(2). Because that analysis is unnecessary when siting energy facilities on non-EFU-zoned land, Farm Bureau petitioners argue that road and highway rights-of-way in EFU zones, in effect, are like non-EFU-zoned lands for the purposes of ORS 215.275(2) and should be considered accordingly. Because our analysis of the latter argument effectively disposes of both assignments of error, we address it first.

ORS 215.203(1) allows areas within counties to be set aside as zones for exclusive farm use:

> "Zoning ordinances may be adopted to zone designated areas of land within the county as exclusive farm use zones. *Land within such zones shall be used exclusively for farm use except as otherwise provided in ORS 215.213, 215.283 or 215.284.* Farm use zones shall be established only when such zoning is consistent with the comprehensive plan."

(Emphasis added.) At the same time, however, the part of the statute highlighted above recognizes another assortment of uses that can take place in EFU zones: specific nonfarm uses "otherwise provided" in ORS 215.213, ORS 215.283, or ORS 215.284. Expressly included within that group is the construction and modification of public roads and highways within EFU zones. *See, e.g.,* ORS 215.283(1)(L) (permitting roadway modifications that do not involve construction of additional travel lanes, removal or displacement of buildings, or creation of new land parcels); ORS 215.283(2)(q), (r) (permitting, with prior approval, construction of passing or travel lanes that require acquisition of right-of-way and road modifications that require building displacement); ORS 215.283(3) (permitting, with prior approval, construction of roads and highways not allowed under subsections (1) and (2) of statute).

■   As a result, rather than categorically distinguishing road-related modifications and construction from the EFU zones in which they occur, ORS 215.203 anticipates inclusion of roads and highways as integral parts of EFU zones, even though they are nonfarm uses. In short, under ORS 215.203,

it is incorrect to view road and highway rights-of-way within EFU zones as non-EFU anomalies that each require separate analysis under ORS 215.275(2). We do not view such rights-of-way as alternatives to EFU zones when, in fact, they are part of such zones. Farm Bureau petitioners' contrary position in their third assignment of error therefore is not well taken. We conclude that the council did not misapply ORS 215.275(2) with regard to the road and highway rights-of-way at issue here.

That conclusion also disposes of Farm Bureau petitioners' second assignment of error. There, they argue that, under the alternatives analysis that ORS 215.275(2) requires, the council incorrectly rejected some road rights-of-way within EFU zones as pipeline sites based on safety concerns and other factors. Although the context of that argument differs slightly from that presented in Farm Bureau petitioners' third assignment of error, it is nevertheless premised on the same mistaken notion that we have identified above, *i.e.*, that the statutes treat road and highway rights-of-way in EFU zones in the same manner as non-EFU-zoned lands. As we have concluded, they do not.

In their fourth assignment of error, Farm Bureau petitioners assert that, in those locations where the council did approve public road and highway rights-of-way as sites for the pipeline, the council nevertheless misconstrued ORS 215.283(1)(L) in doing so. That statute provides:

"The following uses may be established in any area zoned for exclusive farm use:

"* * * * *

"(L)   Reconstruction or modification of public roads and highways, *including the placement of utility facilities* overhead and *in the subsurface of public roads and highways along the public right of way,* but not including the addition of travel lanes, where no removal or displacement of buildings would occur, or no new land parcels result."

(Emphasis added.) Relying on the text highlighted above, Farm Bureau petitioners argued below that locating a pipeline within the "subsurface" of a public road or highway road right-of-way necessitated, as a matter of law, placing it

directly under the hard surface of the road. The council declined to adopt that reading of the statute, and petitioners *now reiterate their argument on review.*

In construing ORS 215.283(1)(L) under the *PGE* methodology, 317 Or at 610-12, we first examine the statute's text and context. *Id.* at 611. The statute's use of the phrase "along the public right of way" and the fact that it modifies the word "overhead" in the statute suggests that the legislature intended that a utility facility may be placed anywhere "along," that is, within the confines of, the right of way. The context of that statutory provision, which includes related statutes, lends substantial support to that interpretation of legislative intent.

■   The zoning statutes contained in ORS chapter 215 do not articulate the defining physical aspects of roads or highways, much less discuss in any detail their subsurfaces. However, statutes expressly devoted to the thoroughfares of this state[9] frequently define roads and highways as encompassing "the entire right of way" upon which the road or highway's hard surface has been built:

> " *'Road' means the entire right of way of any public or private way* that provides ingress to or egress from property by means of vehicles or other means or that provides travel between places by means of vehicles. 'Road' includes, but is not limited to:
>
> "(a)   Ways described as streets, highways, throughways or alleys[.]"

ORS 368.001(6)(a) (emphasis added).

> " *'Public road' means the entire right of way of any road* over which the public has the right of use or any right of way held by the state or a political subdivision of the state for road purposes that is not open for public use."

ORS 376.150(1) (emphasis added).

> " *'State highway,' 'highway' or 'state highway system' means the entire width between the boundary lines of the right of way* of every state highway, as defined by ORS

---

[9] ORS Title 31, Highways, Roads, Bridges, and Ferries.

366.005, and the terms also include the interstate system and the federal-aid primary system."

ORS 377.710(34) (emphasis added). For zoning purposes, the legislature can define roads and highways differently if it chooses, but it has not done so. In the absence of any other definition in the zoning statutes, the statutes noted above provide important contextual clues from which we discern the legislature's intent regarding the roads and highways at issue here. We conclude that, for purposes of ORS 215.283(1)(L), the phrase "public roads and highways" means the entire right-of-way within which those thoroughfares are constructed, not just the hard surface upon which traffic travels. As a result, Northwest Natural could comply with ORS 215.283(1)(L) by burying a pipeline alongside a hard road surface, so long as it remained within the thoroughfare's right-of-way. Farm Bureau petitioners' contrary construction of the statute therefore is not well taken, and the council did not err in so concluding.

In their final assignment of error, Farm Bureau petitioners assert that the council misconstrued and, as a result, failed to satisfy the requirements of ORS 215.275(5). ORS 215.275(5) provides:

> "The governing body of the county or its designee shall impose clear and objective conditions on an application for utility facility siting under ORS 215.213(1)(d) or 215.283(1)(d) to mitigate and minimize the impacts of the proposed facility, if any, on surrounding lands devoted to farm use in order to prevent a significant change in accepted farm practices or a significant increase in the cost of farm practices on the surrounding farmlands."

Farm Bureau petitioners note that, in the administrative rules that the council promulgated, one definition of "mitigation" makes avoiding impacts a priority in the hierarchy of actions that an applicant can take to lessen potentially negative effects in siting an energy facility. *See* OAR 345-001-0010(29).[10] Pointing to that rule, Farm Bureau petitioners

---

[10] OAR 345-001-0010 provides, in part:

"In this chapter, the following definitions apply unless the context requires otherwise or a term is specifically defined within a division or a rule:

"* * * * *

suggest that the term "mitigate" in ORS 215.275(5) warrants a similar construction. They argue that the statutory term compels the council to preempt farmland impacts outright by conditioning compliance with ORS 215.275(5) on avoiding incursions onto actively farmed land where possible. As a result, they argue, the council should have imposed an objective condition requiring Northwest Natural to locate the pipeline under roadways in EFU zones wherever possible or, alternatively, denied Northwest Natural's application. Farm Bureau petitioners contend that the council's failure to do so was error.[11]

■     In construing ORS 215.275(5), we follow the *PGE* methodology, 317 Or at 610-12. In this instance, because the terms "minimize" and "mitigate" do not have special statutory definitions, and do not have any well-understood legal meaning in this context, we give those terms their plain, natural, and ordinary meanings. The dictionary defines, "mitigate" as "to cause to become more gentle or less hostile; * * * to make less severe, violent, cruel, intense, or painful." *Webster's* at 1447. In the context of ORS 215.275(5), that term speaks to lessening the intensity or severity of a particular impact. "Minimize" in turn, means to reduce "to the smallest

---

"(29) 'Mitigation' means taking one or more of the following actions listed in order of priority:

"(a) Avoiding the impact altogether by not taking a certain action or parts of an action;

"(b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation;

"(c) Partially or completely rectifying the impact by repairing, rehabilitating, or restoring the affected environment;

"(d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action by monitoring and taking appropriate corrective measures;

"(e) Partially or completely compensating for the impact by replacing or providing comparable substitute resources or environments; or

"(f) Implementing other measures approved by the Council."

[11] Farm Bureau petitioners go on to argue that, because ORS 215.275(5) requires avoidance of farmland impacts as a threshold matter, the council still must consider road and highway rights-of-way as siting alternatives within EFU zones, even if the alternatives analysis of ORS 215.275(2) is inapplicable in such cases. Our analysis of the primary argument in this assignment of error, however, disposes of the issue before us, obviating the need to address Farm Bureau petitioner's secondary argument at this time.

possible number, degree, or extent[.]" *Webster's* at 1438. It does not, however, mean "eliminate." Thus, the statute assumes that some impact on EFU land is permissible. Put differently, the word connotes reducing, to the extent possible, the frequency with which an impact occurs. When we construe the terms "mitigate" and "minimize" together, they demonstrate that ORS 215.275(5) requires the general reduction in the intensity and frequency of an impact, not, as Farm Bureau petitioners suggest, the absolute avoidance or elimination. The council did not err in declining to adopt that construction of those terms in its final order.

The order of the Energy Facility Siting Council is affirmed.