Argued and submitted May 3, 2004, judgment of circuit court affirmed
October 5, 2006

OREGON TELECOMMUNICATIONS ASSOCIATION,
Colton Telephone Company,
Canby Telephone Association
and Cascade Utilities, Inc.,
*Respondents,*

*v.*

OREGON DEPARTMENT OF TRANSPORTATION,
*Appellant.*

(CC CCV0208620; SC S50709)

144 P3d 935

Keith L. Kutler, Assistant Attorney General, Salem, argued the cause and filed the briefs for appellant. With him on the briefs were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Richard A. Finnigan, Olympia, Washington, argued the cause and filed the brief for respondents. With him on the brief were Jennifer Niegel, and Duncan, Tiger & Niegel, P.C., Stayton.

Timothy J. Sercombe, Preston Gates & Ellis LLP, Portland, filed the brief for *amicus curiae* Northwest Natural Gas Company.

Before Carson,* Chief Justice, and Gillette, Durham, Riggs,** De Muniz,*** Balmer, and Kistler, Justices.

DURHAM, J.

---

* Chief Justice when case was submitted.

** Riggs, J., retired September 30, 2006, and did not participate in the decision of this case.

*** Chief Justice when decision was rendered.

## DURHAM, J.

The issue in this case is whether Article IX, section 3a, of the Oregon Constitution, which we quote below, authorizes the Oregon Department of Transportation (ODOT) to use state highway funds to pay administrative expenses that ODOT incurs in requiring the relocation of utility facilities within a public highway right-of-way.[1]

Plaintiffs Colton Telephone Company, Canby Telephone Association, and Cascade Utilities, Inc. (plaintiff utilities) are Oregon corporations that provide telecommunications services in part through utility facilities installed, with the permission of ODOT, in the rights-of-way of roads and highways over which ODOT has supervision. They are members of a trade association, plaintiff Oregon Telecommunications Association (OTA), that represents local exchange telecommunication companies serving customers in Oregon.

ODOT began several projects to improve certain roads that it supervises. In connection with those projects, ODOT required plaintiff utilities to relocate their utility facilities located in the rights-of-way of the affected roads.

When ODOT requires the relocation of utility facilities, it incurs expenses in conducting planning activities concerning the relocation process. To recover those expenses, ODOT established by rule a schedule of fees that it charged to plaintiff utilities. Pursuant to that rule, OAR 734-055-0017, ODOT charged plaintiff utilities the following fees:

| | | |
|---|---|---|
| Canby Telephone Association | – | $10,000 |
| Cascade Utilities, Inc. | – | $ 4,000 |
| Colton Telephone Company | – | $ 6,000 |

---

[1] In general, highway funds are the proceeds of taxes that the legislature has levied on motor vehicle fuel and motor vehicle ownership, operation, and use. Utility facilities include pipes, conduit, cables, wiring, and related fixtures that aid the transmission of utility products and services. Utilities commonly locate their facilities underground and within public highway rights-of-way.

Plaintiffs filed this action to challenge the authority of ODOT to charge those fees to the plaintiff utilities.[2] They argued that the Oregon Constitution authorized ODOT to use highway funds to recover its expenses incurred in requiring the relocation of utility facilities. In response, ODOT argued that it had no authority to use state highway funds for that purpose and that state law authorized ODOT to recover its expenses from plaintiff utilities pursuant to administrative rules. The trial court rejected ODOT's argument and granted summary judgment for plaintiffs. ODOT appeals from that judgment. For the reasons explained below, we affirm.

■ This court has exclusive jurisdiction over ODOT's appeal. *See* Or Laws 2001, ch 664, § 4 (so stating).[3] Because the trial court resolved this case by summary judgment, we may affirm only if no genuine issues of material fact exist and the prevailing party is entitled to a judgment in that party's favor as a matter of law. *See Jones v. General Motors Corp.*, 325 Or 404, 420, 939 P2d 608 (1997) (stating those standards). Because no party asserts any dispute over the material facts, we review the record to determine whether the circuit court committed an error of law.

■ The focus of this case is Article IX, section 3a, of the Oregon Constitution, which dedicates highway funds exclusively to certain uses related to public highways, roads, streets, and roadside rest areas. That section of the constitution provides, in part:

"(1) Except as provided in subsection (2) of this section, revenue from the following shall be used exclusively for the construction, reconstruction, improvement, repair, maintenance, operation and use of public highways, roads, streets and roadside rest areas in this state:

---

[2] In the trial court, the parties stipulated that the only costs in dispute are "ODOT's cost of reviewing plans and administering the construction of utility facilities relocated at ODOT's request." Those disputed costs arise from " 'Schedule B' permit fees" that ODOT assessed pursuant to OAR 734-055-0017(1)(b) (describing fees applicable under Utility Facility Permit Fee Schedule "B").

[3] The legislature adopted Oregon Laws 2001, chapter 664, section 4, in 2001 as a temporary provision. *See* note preceding ORS 374.305 (quoting 2001 enactment).

"(a)  Any tax levied on, with respect to, or measured by the storage, withdrawal, use, sale, distribution, importation or receipt of motor vehicle fuel or any other product used for the propulsion of motor vehicles; and

"(b)  Any tax or excise levied on the ownership, operation or use of motor vehicles.

"(2)  Revenues described in subsection (1) of this section:

"(a)  May also be used for the cost of administration and any refunds or credits authorized by law."

Before addressing the meaning of that constitutional provision, we first discuss several statutes that pertain to the constitutional issue that this case presents. ORS 758.010(1) grants to plaintiff utilities a "right and privilege" to place utility facilities along the public roads in Oregon or across rivers or lands owned by the state. That statute provides, in part:

"Except within cities, any person or corporation has a right and privilege to construct, maintain and operate its water, gas, electric or communication service lines, fixtures, and other facilities along the public roads in this state, as defined in ORS 368.001[4] or across rivers or over any lands belonging to the state, free of any charge other than charges allowed under section 2, chapter 664, Oregon Laws 2001 [discussed below] * * *."

ODOT supervises Oregon's state highways. ORS 366.205. The legislature has authorized ODOT under ORS 758.010(2)

"to designate the location upon [state highways], outside of cities, where lines, fixtures and facilities described in this section may be located, and may order the location of any such line, fixture or facility to be changed when such governing body or department deems it expedient."

---

[4] ORS 368.001(5) defines "public road" as "a road over which the public has a right of use that is a matter of public record."

ORS 758.010(3) also authorizes ODOT to

> "impose reasonable requirements for the location, construc-
> tion, operation and maintenance of the lines, fixtures and
> facilities on such land [under the supervision of ODOT]."

Utilities must obtain written permission from ODOT to place their facilities in the right-of-way of a state highway.[5] ORS 374.305(1). ORS 374.310(1) authorizes ODOT to issue permits to utilities for their use of the right-of-way of a state highway.

For many years, ODOT had used highway funds to pay for the agency's administrative expenses in installing or relocating utility facilities in the right-of-way of state highways. However, on January 31, 2001, the Attorney General issued to ODOT an informal letter opinion that caused ODOT to reconsider its authority to use highway funds to pay for its expenses in overseeing the installation of utilities in state highway rights-of-way. The Attorney General opined that, in two cases, this court had adopted a restrictive construction of Article IX, section 3a. The cases were *Automobile Club v. State of Oregon*, 314 Or 479, 840 P2d 674 (1992), and *Rogers v. Lane County*, 307 Or 534, 771 P2d 254 (1989). The Attorney General concluded that the collective rationale of those cases prohibited the expenditure of highway funds to pay for ODOT's expenses in the permit process for plan review, supervision, and the implementation of utility facility installation or relocation.

Following issuance of the informal letter opinion by the Attorney General, the legislature enacted Oregon Laws 2001, chapter 664, section 2(1), which authorized ODOT to

---

[5] The term "right-of-way," in this context, refers to "the strip of land devoted to or over which is built a public road * * *." *Webster's Third New Int'l Dictionary* 1956 (unabridged ed 2002). The legislature has not supplied a special definition for that phrase. Illustrating the scope of the accepted legal meaning of that term, this court in *Friends of Parrett Mountain v. Northwest Natural*, 336 Or 93, 113, 79 P3d 869 (2003), construed the phrase "public roads and highways" in ORS 215.283(1)(L), stating that that phrase

> "means the entire right-of-way within which those thoroughfares are con-
> structed, not just the hard surface upon which traffic travels. As a result,
> Northwest Natural could comply with ORS 215.283(1)(L) by burying a pipeline
> alongside a hard road surface, so long as it remained within the thoroughfare's
> right-of-way."

"charge a permit fee to any person or corporation that, in accordance with ORS 758.010, constructs, maintains or operates water, gas, electric or communication service lines, fixtures or other facilities in the right of way of a state highway * * *."[6]

However, the legislature also placed a condition on ODOT's authority to impose a permit fee: ODOT had no statutory authority to charge a permit fee "if the costs to the department of issuing the permit and administering its terms may legally be paid from revenues described in section 3a(1), Article IX of the Oregon Constitution." *Id.* § 2(2). The present case is an outgrowth of the policy choice that that statute embodied.

We must determine the meaning of Article IX, section 3a, because ODOT had statutory authority to charge permit fees to plaintiff utilities only if ODOT had no authority under Article IX, section 3a, to use highway funds to cover its expenses. Stating the issues in the terms of Article IX, section 3a(1), we must decide whether the expenses that ODOT incurs in this context are "exclusively for the construction, reconstruction, improvement, repair, maintenance, operation and use of public highways, roads, streets and roadside rest areas," within the meaning of section 3a(1), or constitute a "cost of administration" within the meaning of section 3a(2)(a). If Article IX, section 3a, does authorize ODOT to use highway funds to cover its expenses, then ODOT would have to look to highway funds for payment of its expenses and would have no statutory authority to charge permit fees to plaintiff utilities to cover its expenses.

The people of Oregon adopted Article IX, section 3a, in 1980 following referral by the legislature. *See Rogers*, 307 Or at 541-42 (explaining history of enactment). This court interprets a constitutional provision adopted through the referral process by following the methodology established in *Roseburg School Dist. v. City of Roseburg*, 316 Or 374, 851 P2d 595 (1993), and *Ecumenical Ministries v. Oregon State Lottery Comm.*, 318 Or 551, 871 P2d 106 (1994). *See Stranahan v. Fred Meyer, Inc.*, 331 Or 38, 57, 11 P3d 228 (2000) (so holding). As

---

[6] The legislation that authorizes ODOT to charge the permit fee also repeals that authority on January 2, 2008. Or Laws 2005, ch 178, § 1.

part of our initial analysis under that methodology, we consider the text of the provision that the voters adopted and the relevant case law interpreting that provision. *Stranahan*, 331 Or at 61. If the intent of the voters is not clear after that inquiry, we then will examine the history of the provision. *Coultas v. City of Sutherlin*, 318 Or 584, 590, 871 P2d 465 (1994), *Ecumenical Ministries*, 318 Or at 559. The history of the provision includes "sources of information that were available to the voters at the time the measure was adopted and that disclose the public's understanding of the measure." *Id.* at 560 n 8.

We first turn to the text of Article IX, section 3a(1). ODOT argues that its expenses in administering the relocation of utilities do not fall within the scope of that provision because utility facilities are not an intrinsic element of a public highway and, once placed in the right-of-way of a public highway, do not become the public highway. Plaintiffs assert that ODOT improperly characterizes the issue and contend that the question is whether ODOT's costs in administering "the utility's relocation of its facilities during ODOT road reconstruction projects can be paid for with highway funds." Plaintiffs argue that those costs arise from the kinds of construction activities to which Article IX, section 3a(1) refers and, therefore, paying for those costs is a permissible use of state highway funds.

This court previously has interpreted section 3a(1). We will consider that prior case law as part of our analysis of the constitutional text. *Stranahan*, 331 Or at 61. In *Rogers*, this court considered whether Article IX, section 3a(1), prohibited the use of state highway funds to pay for a parking lot and a covered pedestrian walkway between the parking lot and the terminal at the Eugene municipal airport. 307 Or at 534. Lane County argued that, although the parking lot and walkway were not in themselves public roads, the expenditures associated with the parking lot and walkway qualified under section 3a(1) as those for the "improvement, * * * operation and use" of the public roads.

The opinion for a plurality of the court quoted the relevant terms of the constitution and then proceeded to review the legislative history of the Senate joint resolution

and the resulting ballot measure, including a joint legislative committee argument in the voters' pamphlet favoring adoption, that ultimately led to the voters' adoption of Article IX, section 3a. *Rogers,* 307 Or at 539-43. The plurality opinion noted that the voters' pamphlet statement said that it was "time to stop the raid" on state highway funds. *Id.* at 542-43. According to the voters' pamphlet statement, the referred measure would stop that "raid" by requiring the state to use highway funds for the purposes listed in the measure and by eliminating expenditures for so-called "highway-related programs," such as state police and parks. *Id.*

The *Rogers* plurality determined that the voters' pamphlet statement expressed the joint legislative committee's intent to require

"* * * a narrow application of this new constitutional provision to the specific purposes stated. Accordingly, we narrowly construe Article IX, section 3a.

"Because the language of Article IX, section 3a, must be narrowly construed, expenditures of motor vehicle and fuel taxes within the meaning of 'improvement, * * * operation and use' must be limited exclusively to expenditures on highways, roads, streets and roadside rest areas themselves and for other projects or purposes within or adjacent to a highway, road, street or roadside rest area right-of-way that primarily and directly facilitate motorized vehicle travel. In the instant case, the proposed expenditure of highway funds for the construction of an airport parking lot and a covered walkway from the parking lot to the airport terminal is simply a convenient 'raid' on highway funds. The expenditure does not fall within these definitions, because the proposed expenditure is an expenditure for the construction of an airport parking lot and covered walkway, rather than an expenditure for a highway, road, street or roadside rest area itself. Further, it is an expenditure primarily for the operational convenience of an airport, rather than for a project or purpose within or adjacent to a highway, road, street or roadside rest area right-of-way that primarily and directly facilitates motorized vehicle travel."

*Id.* at 545.

In *Automobile Club,* the state collected a fee from persons who received gasoline intended for resale and stored

it in an underground tank. The state then used the fund derived from the collected fees to assist rural gas stations struggling financially to conform with federal environmental regulations. 314 Or at 489. This court determined that the fee was a "tax" under Article IX, section 3a. *Id.* at 491. Applying the analysis adopted in *Rogers*, this court held that the "fund clearly [did] not provide for construction, improvement, repair, maintenance, or use of highways" and that the subsidy did not "fall within the meaning that this court has attached to 'operation and use' of a highway, *viz.*, it [did] not 'primarily and directly facilitate motorized vehicle traffic'." *Automobile Club*, 314 Or at 490-91 (citing *Rogers*, 307 Or at 545).

ODOT urges us to apply several legal criteria that this court, particularly in *Rogers*, drew from the views expressed in the voters' pamphlet statement supporting adoption of the referred measure that ultimately became Article IX, section 3(a). For example, the *Rogers* plurality stated that the wording of the voters' pamphlet argument

"demonstrates that the Joint Legislative Committee clearly intended a *narrow application* of this new constitutional provision to the specific purposes stated. Accordingly, we *narrowly construe* Article IX, section 3a."

*Rogers*, 307 Or at 545 (emphasis added). The consequence of the perceived requirement of a "narrow" construction, said the *Rogers* plurality, was that expenditures of highway funds "must be limited exclusively to expenditures on highways, roads, streets and roadside rest areas themselves and for other projects or purposes *within or adjacent to* a highway, road, street or roadside rest area right-of-way that *primarily and directly facilitate motorized vehicle travel*." *Id.* (emphasis added).[7]

ODOT's argument is correct insofar as it emphasizes the constitutional requirement that the state use highway funds "exclusively" for the purposes that Article IX, section 3a,

---

[7] The *Rogers* plurality used the term "right-of-way" in its legal analysis, but that term does not appear in Article IX, section 3a. For present purposes, we accept that the *Rogers* plurality was correct in assuming that, under that constitutional provision, "public highways, roads, [and] streets" includes the entire right-of-way for those thoroughfares, and not just the surface on which the public travels.

identifies and no others. However, the discussion in *Rogers* of other legal criteria suggested by the voters' pamphlet statement supporting the referred measure, but not reflected in the constitutional text, was not intended by this court to serve as the final word on the meaning of the constitutional text. In fact, neither *Rogers* nor *Automobile Club* undertook the methodological examination of the intent behind Article IX, section 3a, that this court follows at the present time. That is understandable; those cases predated this court's decisions in *Roseburg School Dist.* and *Ecumenical Ministries*. *Automobile Club* purported only to repeat the various tests that the *Rogers* plurality recited. This case presents another opportunity to examine the terms of Article IX, section 3a, in still another factual context. In doing so, we simply continue the analytical work that *Rogers* and *Automobile Club* began.[8] We turn now to that task.

For ease of analysis, we repeat here the central requirement in Article IX, section 3a, that highway funds

"shall be used exclusively for the construction, reconstruction, improvement, repair, maintenance, operation and use of public highways, roads, streets and roadside rest areas in this state * * *."

Article IX, section 3a, does not provide special definitions for the key terms that it uses. Therefore, we accord those terms their ordinary meaning. *Flavorland Foods v. Washington County Assessor*, 334 Or 562, 568, 54 P3d 582 (2002).

The processes of "construction, reconstruction, improvement, repair, [and] maintenance" involve work on a public highway that may range from a single, brief event to a long-term construction project consisting of multiple stages. Although "construction," in context, most readily implies the initial building and completion of a highway, "reconstruction, improvement, repair, [and] maintenance" describe activities performed on an existing public highway sometime after its initial construction.

---

[8] In noting those features of the reasoning employed in *Rogers* and *Automobile Club*, we do not suggest that the ultimate holdings in those cases were erroneous. Neither the parties nor *amicus curiae* contend that this court wrongly decided those cases.

■      When given a straightforward reading, Article IX, section 3a, limits the use of highway funds exclusively to a list of processes or activities ("construction," "reconstruction," etc.) that bear a relation to public highways defined by the preposition "of."[9] In context, the term "of" requires that the process or activity be "with reference to," "relating to," or "about" the public highway. *Webster's Third New Int'l Dictionary* 1565 (unabridged ed 2002). Thus, contrary to ODOT's argument, the focus of the text is on the connection between the process or activity and the public highway, not the connection between the process or activity and motor vehicle traffic that may from time to time use the public highway.

ODOT also argues that the ultimate objective of Article IX, section 3a, is the protection or enhancement of some benefit to the traveling public. According to ODOT, the *removal* of utility facilities from a public highway arguably might afford some benefit to the traveling public, but the *relocation* of utility facilities within a public highway does not.

ODOT quite naturally focuses on what is perhaps the most common use of public highways: vehicular travel. But, precisely because of that focus, ODOT's argument invites us to read into the constitutional text a qualification that does not exist: that the promotion of vehicular travel is the *only* purpose for which the state may spend highway funds under Article IX, section 3a. We cannot imply that limitation from the constitutional text. The focus on the constitutional text is, instead, on whether the state spends highway funds exclusively for the construction, reconstruction, etc., *of public highways*.[10]

The parties agree that ODOT ordered the relocation of utility facilities here as part of two larger road projects undertaken to improve the safety of the affected roads and to

---

[9] The thoroughfares to which Article IX, section 3a(1), refers are "public highways, roads, [and] streets * * *." Our analysis applies to each of those categories, but, for ease of discussion, we refer here only to public highways.

[10] Were the foregoing not correct, the use of highway funds, for example, to narrow or to close a public highway would not expand or enhance the public's use of the highway for vehicular travel *per se* and, therefore—under ODOT's theory—would be illegal.

enhance the ability of the public to travel on the affected highways. The resolution of this case does not require us to provide a complete list of the processes and activities for which the state may spend highway funds under Article IX, section 3a. Rather, it is sufficient to conclude, as we do, that the administration of the relocation of utility facilities by ODOT in connection with those road projects belongs on that list.[11]

Although several of the processes and activities mentioned in Article IX, section 3a, arguably might characterize the road projects in question, we think that the terms "reconstruction" and "improvement" together describe the road projects precisely. "Reconstruction" means "the action of reconstructing or state of being reconstructed." *Webster's* at 1898. "Improvement" means, as pertinent here:

> "[T]he act or process of improving * * * the enhancement or augmentation of value or quality * * * a permanent addition to or betterment of real property that enhances its capital value and that involves the expenditure of labor or money and is designed to make the property more useful or valuable as distinguished from ordinary repairs * * *."

*Id.* at 1138. The road projects here easily correspond to those definitions.

Putting the matter in constitutional terms, ODOT's review of plans, supervision of construction and related activities regarding the required relocation of utility facilities was an important aspect of the reconstruction and improvement of the public highways within the meaning of Article IX, section 3a. As a factual matter, the utility facilities were buried under the highway rights-of-way. The parties agree that, unless the plaintiff utilities relocated their utility facilities during the road improvement projects, future repairs to the utility facilities would disrupt travel on the roads. As a consequence, the planning and administration activities of ODOT regarding the relocation of utility facilities were component parts of the reconstruction and improvement of the roads in question by ODOT.

---

[11] The "project" under analysis here is the reconstruction of the highway, and not only the aspect of the project, *i.e.*, relocation of utility facilities, that gave rise to ODOT's administrative costs.

It follows from the foregoing that the expense that ODOT incurs in planning for the relocation of utility facilities along a public highway is a cost for which ODOT may use highway funds under Article IX, section 3a. That conclusion obviates the necessity of deciding, within our authority under Oregon Laws 2001, chapter 664, section 4(1), whether the expense of planning the relocation of utility facilities constitutes a "cost of administration" within the meaning of Article IX, section 3a(2)(a). Because our review of the text and context of Article IX, section 3a, makes clear the intent of the voters in adopting that provision, we proceed no further. *Roseburg School Dist.*, 316 Or at 378 ("[I]f the intent is clear based on the text and context of the constitutional provision, the court does not look further.").

The trial court determined that ODOT had no statutory authority to charge a permit fee to the utilities because the costs to ODOT of issuing the permit to relocate utility facilities and to administer its terms "may legally be paid from revenues described in section 3a(1), Article IX of the Oregon Constitution." Or Laws 2001, ch 664, § 2(2). That conclusion was correct. Consequently, the trial court did not err in granting plaintiffs' motion for summary judgment.

The judgment of the circuit court is affirmed.