Argued and submitted May 11, order of Energy Facility Siting Council affirmed
September 29, 2005

In the Matter of the Application for
a Site Certificate for the COB Energy Facility

SAVE OUR RURAL OREGON,
Carl and Susie Gibson,
William and Melyn M. "Lyn" Brock,
Lewis W. Sowles, Maryann Reed,
Mary Kent, Cheri Madsen,
Mario and Diana Giordano,
Douglas Madsen, Marsha Robinson,
Roger Hamilton, Berkeley Cone,
Douglas and Gail Whitsett,
Lynda King-Clegg, Ann S. Fairclo,
Don Rajnus, Cindy Deas,
Darrel and Traudy Bagley,
and Water for Life,
*Petitioners,*

*v.*

ENERGY FACILITY SITING COUNCIL,
*Respondent,*

*and*

COB ENERGY FACILITY LLC,
*Intervenor.*

(SC S52315)

121 P3d 1141

354

Edward J. Sullivan, Garvey Schubert Barer, Portland, argued the cause and filed the briefs for petitioners. With him on the briefs was Carrie A. Richter.

Denise J. Fjordbeck, Assistant Attorney General, Salem, argued the cause and filed the briefs for respondent Energy Facility Siting Council. With her on the briefs were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

James N. Westwood, Stoel Rives LLP, Portland, argued the cause and filed the briefs for Intervenor COB Energy Facility LLC. With him on the briefs were Timothy L. McMahan, Michelle M. Rudd, and Peter D. Mostow.

BALMER, J.

**BALMER, J.**

Petitioners seek judicial review of a final order of the Energy Facility Siting Council (council) granting a site certificate that would allow COB Energy Facility LLC (COB) to build an energy facility in Klamath County. Petitioners are 22 Klamath County residents who live near the site of the proposed facility and two organizations representing those residents. Respondents are the council and COB. This case comes to us on direct review of the council's final order. ORS 469.403(3) (providing for direct review by this court in such cases).

We review final orders of the council for errors of law, abuse of agency discretion, and lack of substantial evidence in the record to support the challenged findings of fact. ORS 469.403(6); ORS 183.482(7), (8); *see also Friends of Parrett Mountain v. Northwest Natural*, 336 Or 93, 96, 79 P3d 869 (2003) (so stating). In this case, petitioners' assignments of error raise only the first and the last kinds of issues. For the reasons we explain below, we conclude that, with one exception, the council did not commit legal error and that its challenged findings of fact are supported by substantial evidence in the record. As to the one respect in which the council erred—its interpretation of ORS 469.504, which sets out the procedure for determining a proposed facility's compliance with land use planning goals—we nevertheless conclude that the council correctly determined that the proposed facility complied with those goals. Accordingly, we affirm the council's order.

## I. FACTS AND PROCEDURAL HISTORY

As noted, petitioners seek judicial review of the council's decision to issue a site certificate allowing COB to build an energy facility. The legislature has entrusted the council with the authority to decide whether to issue a site certificate. ORS 469.470(1). The council's decision to issue a site certificate "binds state, county, and city governments in accordance with the council's determination and requires state agencies and local governments to issue any permits specified in the site certificate without further proceedings."

*Friends of Parrett Mountain*, 336 Or at 96; *see also* ORS 469.300(26) (defining "site certificate"). An applicant for a site certificate begins the application process by submitting to the council a Notice of Intent (NOI) that provides information about the proposed site and the characteristics of the proposed facility. ORS 469.330(1). After receiving the NOI, the council notifies the public, providing information regarding the site and the facility. ORS 469.330(2). The State Department of Energy (department) then prepares a project order that, based on applicable statutes, rules, and standards, establishes the legal requirements for an application for a site certificate (ASC). ORS 469.330(3).

After completing the project order's requirements, the applicant must submit its ASC to the council. ORS 469.350(1). The NOI and the ASC then are sent for comment and recommendation to various state agencies and affected cities and counties. ORS 469.350(2). The department reviews the ASC to determine whether it is complete. ORS 469.350(4). When the department determines that the ASC is complete, it notifies the applicant and the public. *Id.* Based on its review of the ASC and the comments and recommendations that it receives, the department prepares and issues a draft proposed order. ORS 469.370(1). The council then holds one or more public hearings regarding the ASC and the draft proposed order in the area affected by the ASC and elsewhere, as the council considers necessary. ORS 469.370(2). The department reviews the testimony from the public hearing or hearings, consults with other agencies, reviews the draft proposed order in light of the information that it has received, issues a proposed order, and notifies the public of the proposed order and that the council will hold a contested case hearing to consider adoption of the proposed order. ORS 469.370(4). On receipt of the proposed order from the department, the council conducts the contested case hearing, following the procedures outlined in ORS 183.413 to 183.470. ORS 469.370(5). Following that hearing, the council issues a final order approving or rejecting the ASC. ORS 469.370(7).

A. *COB's Application for a Site Certificate*

In accordance with the procedures described above, on December 3, 2001, COB submitted an NOI to file an ASC

to build a power generation facility in Klamath County. The council provided notice of the NOI, and the department prepared a project order establishing the requirements for the ASC. On September 5, 2002, COB filed its ASC with the department. On April 30, 2003, the department issued a public notice that the ASC was complete. The notice described the ASC as proposing a "natural gas-fired, combustion turbine, combined-cycle energy facility in Klamath County near Bonanza, Oregon," capable of generating 1150 megawatts of electricity. According to the notice, the water-cooled facility would require between 5,390 and 7,590 gallons of water per minute, which COB proposed to draw from deep wells in the Lost River Basin by means of a new water pipeline and reservoir. The proposed facility would use natural gas from one or both existing gas pipelines, which would be connected to the facility by a new 4.1-mile distribution line. The facility would deliver electric power to the regional power grid at the nearby Captain Jack Substation via a 7.2-mile transmission line occupying a 154-foot-wide corridor. The facility would require approximately 194 acres of land, which would be situated within a 749-acre parcel owned by COB. Of those 194 acres, 42.5 were to be used for the main facility and the remainder for ancillary applications including wastewater management areas, the natural-gas pipeline, the electrical transmission line, and a water-supply system. Klamath County had zoned most of the 194 acres for Exclusive Farm Use (EFU); it had zoned some of that acreage for forestry.

In addition to describing the proposed facility, the notice informed the public of the process for evaluating the ASC, beginning with an open comment period that ended on June 23, 2003. In particular, it stated that the council intended to review the ASC to determine whether it "complies with Klamath County's land use and zoning ordinances as well as with state land use laws," noted that the project "would require an exception from Goal 3 of the * * * statewide planning goals," and stated that the council's "rules for evaluating a Goal 3 exception can be found at ORS 469.504(2)."[1]

---

[1] As we describe below, the statewide land use planning goals adopted by the Land Conservation and Development Commission (LCDC) set out broad objectives for land use planning in Oregon. ORS 197.225 to 197.250. Goal 3 generally aspires to preserve and maintain agricultural lands for farm use.

## B.  *Notice and Comment*

During the notice and comment period, the department held public meeting at which residents could ask questions and make comments regarding the ASC.[2] The department received oral and written comments from residents of the area surrounding the proposed site, including most of the petitioners.

On June 11, 2003, in response to comments criticizing the proposed facility as using too much water, COB informed the department that it intended to amend the ASC to reflect a proposal for an air-cooled, rather than a water-cooled, facility. On July 28, 2003, the department issued a public notice indicating that it had received that amendment and that it would allow a three-week period for comments on it. The notice described the amendment as reducing the proposed facility's water requirements from approximately 7,500 gallons per minute to 210 gallons per minute and reducing the size of the proposed overall facility from 194 acres to between approximately 104 and 140 acres, depending on the method of wastewater treatment. The amendment also increased the size of the main facility from 42.5 acres to 50.6 acres.

## C.  *Orders and Contested Case Proceeding*

On December 30, 2003, the department issued a draft proposed order recommending approval of the ASC. The council held public hearings on the draft proposed order, and the department issued a proposed order on March 16, 2004. That order proposed to approve the project. One month later, the department issued a supplement to the order imposing several conditions on its proposed approval of the ASC.[3]

Petitioners objected to the proposed order. They requested (and were granted) party status in the contested case proceeding that the council scheduled to consider the

---

[2] The department accepted public comment during the period preceding the draft proposed order, although it was not required to do so. *See* ORS 469.350 (describing required process).

[3] Those conditions related to the construction process for the proposed facility and the creation of a program to monitor the proposed pipeline.

proposed order. Petitioners argued, among other things, that the proposed order misinterpreted ORS 469.504's standards for determining compliance with statewide planning goals and taking exceptions to them, that it lacked substantial evidence to support taking exceptions to Goal 3 and Goal 4, that the department should have promulgated rules to define certain statutory terms before issuing the proposed order, and that the proposed order lacked substantial evidence for its conclusions that COB had complied with geologic and water standards. At the conclusion of the contested case proceeding, the department's hearings officer issued a recommended order generally approving the ASC.[4]

The council chair received the recommended order, and, in response to legal issues that the petitioners raised, requested that the hearings officer reconsider part of the recommended order in light of the proper standard for assessing the weight of the evidence. The hearings officer reconsidered and issued a supplemental recommended order. After oral argument by the parties, the council decided to approve the ASC. The final order issued a site certificate for the proposed facility, with certain conditions. The present petition seeks judicial review of the council's decision in this court. ORS 469.403(3).

## II. PROPOSED FACILITY'S COMPLIANCE WITH STATEWIDE PLANNING GOALS

We turn now to the legal issues presented. Petitioners assign error to the council's construction of ORS 469.504. That statute, pertinent parts of which we set out below, provides the method for determining whether an ASC complies with statewide land use planning goals. We first provide an overview of ORS 469.504. We then describe the council's interpretation and application of that statute in this case and petitioners' challenges to the council's analysis and conclusions. Next, we review the words and structure of the statute in detail as part of our interpretation of the statute. As we noted at the outset, although we conclude that the council

---

[4] The council conducts contested case proceedings using a hearings officer, but the final authority for approving or disapproving a proposed facility rests with the council.

misconstrued the specific manner in which ORS 469.504 applies in this case, we conclude, nevertheless, that the council's findings and determinations support its conclusion that the proposed facility complies with statewide planning goals under ORS 469.504, as properly interpreted.

### A. Overview of ORS 469.504

Oregon's statewide land use planning goals, adopted by the Land Conservation and Development Commission (LCDC), set out broad objectives for land use planning in Oregon. Local governments implement those objectives in local comprehensive plans. ORS 197.225 to 197.250. ORS 469.503(4) provides that the council may not issue a site certificate approving an ASC unless the proposed facility complies with the statewide planning goals. ORS 469.504, in turn, provides the guidelines for determining whether the ASC complies with those goals.

ORS 469.504(4) allows the applicant to decide whether it will demonstrate compliance with statewide planning goals under ORS 469.504(1)(a) (in which case, compliance is determined by the affected local government) or under ORS 469.504(1)(b) (in which case, compliance is determined by the council). In this proceeding, COB elected to have the council determine compliance with land use planning goals. In that circumstance, ORS 469.504(5) provides that the council shall designate a "special advisory group" consisting of the governing body of the local government in which the proposed facility is located and that it shall charge that group with recommending "applicable substantive criteria" for the council to use in making its determination. If the special advisory group fails to respond in a timely manner, then the council

> "may either determine and apply the applicable substantive criteria under subsection (1)(b) of this section or determine compliance with the statewide planning goals under subsection (1)(b)(B) or (C) of this section."

ORS 469.504(1)(b) provides that a proposed facility shall be found in compliance with the statewide planning goals if:

"(b)   The Energy Facility Siting Council determines that:

"(A)   The facility complies with applicable substantive criteria from the affected local government's acknowledged comprehensive plan and land use regulations that are required by the statewide planning goals and in effect on the date the application is submitted, and with any Land Conservation and Development Commission administrative rules and goals and any land use statutes directly applicable to the facility under ORS 197.646(3);

"(B)   For an energy facility or a related or supporting facility that must be evaluated against the applicable substantive criteria pursuant to subsection (5) of this section, that the proposed facility does not comply with one or more of the applicable substantive criteria but does otherwise comply with the applicable statewide planning goals, or that an exception to any applicable statewide planning goal is justified under subsection (2) of this section; or

"(C)   For a facility that the council elects to evaluate against the statewide planning goals pursuant to subsection (5) of this section, that the proposed facility complies with the applicable statewide planning goals or that an exception to any applicable statewide planning goal is justified under subsection (2) of this section."

B.   *Council's Interpretation and Petitioners' Objections*

In this proceeding, the council appointed the Klamath County Board of Commissioners (county board) as the "special advisory group" and requested that the county board recommend criteria to evaluate the proposed facility. The county board never made any recommendations.[5] In its final order, the council stated that its regular procedure to evaluate whether a proposed facility meets statewide goals is to look first to the "applicable substantive criteria" from the local land use comprehensive plan and zoning ordinance, along with any directly applicable statutes and rules, as

---

[5] Although the county board made no recommendations, the county's planning director, after the date set by the council and without purporting to act on behalf of the county board, provided the department with portions of the Klamath County Land Development Code, zoning ordinances, and conditional-use criteria. He further stated in a letter to the council that COB had addressed the applicable criteria to his satisfaction.

described in ORS 469.504(1)(b)(A). If any local standard is not met, then the council's practice is to follow ORS 469.504(1)(b)(B) and consider whether the ASC complies with statewide planning goals and, to the extent that it does not, whether an exception to those goals is justified. The council followed that procedure here, determining that the proposed facility met most of the local criteria but that there were several aspects of the proposed facility that did not meet local criteria. It determined that those nonconforming aspects also did not meet statewide goals, but that they qualified for exceptions to those goals under the goal exception criteria of ORS 469.504(2).

The parties disagree as to whether the council must select and use only *one* of the three "tracks" identified in the three subparagraphs of ORS 469.504(1)(b) when evaluating a proposed facility or whether it may choose to use a combination of those "tracks." Petitioners argue that the council misapplied the statutory criteria in paragraph (1)(b) because it approved certain aspects of the facility under subparagraph (1)(b)*(A)* and other aspects under subparagraph (1)(b)*(B)*. They contend that the plain text of that statute establishes those two subsections as separate methods for determining whether the land use requirements are met and that the council may choose one or the other, but it cannot choose both.[6] COB and the council respond that because the three subparagraphs of paragraph (1)(b) are related by the conjunction "or," the council may, as it did here, determine that a proposed facility complies with land use planning requirements by evaluating different aspects of the facility under a combination of subparagraphs (A) and (B). They point out that their interpretation advances the policy goal of requiring the council to consider both local land use standards and statewide goals.

## C.  *Interpretation of ORS 469.504*

■    Cautioning the reader at the outset that this statutory interpretation exercise involves mind-numbing detail, we begin our analysis with the text of ORS 469.504(5). That

---

[6] The council did not purport to apply ORS 469.504(1)(b)(C), and no party argues that the council should have applied that subsection.

provision requires the council to consider local "applicable substantive criteria" in reviewing an ASC for compliance with land use planning goals and, in petitioners' view, directs the council to choose only one of the three tracks for compliance set out in ORS 469.504(1)(b). The dispute between the parties centers on the relationship between paragraph (1)(b) and section (5) of ORS 469.504.

■ ORS 469.504(5), quoted previously, provides that *"[i]f* the special advisory group does not recommend applicable substantive criteria * * * the council may *either* determine and apply the applicable substantive criteria under subsection (1)(b) of this section *or* determine compliance with the statewide planning goals under subsection (1)(b)(B) or (C) of this section."[7] (Emphasis added.) That provision plainly gives the council a choice; the parties, however, disagree about the nature of that choice.

As noted, petitioners argue that ORS 469.504(5) requires the council to choose one and only one "track" within ORS 469.504(1)(b). They advance several distinct theories in support of their interpretation. First, petitioners argue that the reference in ORS 469.504(5) to "subsection (1)(b)" must be a scrivener's error, that the legislature intended in that section to refer to "the applicable substantive criteria under subsection (1)(b)*(A)*," and that, therefore, the council only may apply *one* of the subparagraphs of paragraph (1)(b)—either (A), (B), or (C)—throughout its consideration of an ASC.

We reject petitioners' first argument because it is inconsistent with the text of the statute as enacted by the legislature. If the special advisory group does not recommend

---

[7] The phrase "applicable substantive criteria" also is used in ORS 469.504(1)(b)(A) and (1)(b)(B). Subparagraph (1)(b)(A) clarifies that the legislature understood that phrase to denote criteria "from the affected local government's acknowledged comprehensive plan and land use regulations that are required by the statewide planning goals and in effect on the date the application is submitted[.]" Because "use of the same term throughout a statute indicates that the term has the same meaning throughout the statute," *PGE v. Bureau of Labor and Industries,* 317 Or 606, 611, 859 P2d 1143 (1993), we determine that the references to "applicable substantive criteria" in ORS 469.504(1)(b)(B) and (5) also denote those local regulations. *See also Columbia Steel Castings Co. v. City of Portland,* 314 Or 424, 430, 840 P2d 71 (1992) ("Generally, and in the absence of some specific indication of a contrary intent, terms are read consistently throughout a statute.").

applicable substantive criteria, then ORS 469.504(5) allows the council to choose whether to "determine and apply" those criteria under paragraph (1)(b) or to determine compliance with statewide planning goals under subparagraph (1)(b)(B) or (C). Contrary to petitioners' assertion, there is nothing absurd about that result. Subparagraph (1)(b)(A) and (1)(b)(B) both refer to "applicable substantive criteria," so it is not anomalous for section (5) to allow the council to "determine and apply" those criteria "under subsection (1)(b)" and to interpret that reference to include at least subparagraphs (A) and (B) within that subsection. If the legislature had intended, in section (5), to refer to subparagraph (1)(b)*(A)* rather than paragraph (1)(b), it presumably would have said so, and there is no compelling reason in the structure or application of the statute to assume that the legislature unintentionally erred in that way.

Petitioners next point out that parts of ORS 469.504(5) not applicable in this case expressly authorize the council to consider *both* the local applicable substantive criteria *and* statewide planning goals.[8] That fact, they assert, demonstrates that if the legislature had intended to authorize the council to consider *both* the applicable substantive criteria *and* statewide planning goals with respect to facilities that are evaluated under paragraph (1)(b), it expressly would have provided so. Petitioners note that section (5) expressly authorizes consideration of both the criteria and the goals only when the special advisory group has recommended applicable substantive criteria, a predicate that is not met in this case.

Petitioners are correct that one sentence in ORS 469.504(5) expressly authorizes the council to consider the criteria or the goals or a combination of both in certain circumstances when the special advisory group has recommended applicable substantive criteria. That observation,

---

[8] For example, ORS 469.504(5) provides that if a special advisory group recommends applicable substantive criteria for certain energy facilities "that pass[ ] through more than one jurisdiction or more than three zones in any one jurisdiction," then the council is to determine whether to apply the applicable substantive criteria, the statewide planning goals, or "a *combination* of the applicable substantive criteria and statewide planning goals." (Emphasis added.)

however, does not answer whether the council was authorized to consider both the criteria and the goals when the special advisory group has *not* recommended any criteria. Petitioners' argument still succeeds or fails depending on whether the council had authority to consider both the criteria and the goals under paragraph (1)(b)—an argument they raise separately and to which we now turn.

Petitioners argue that, even if the reference in ORS 469.504(5) to "subsection (1)(b)" refers to all three subparagraphs of that paragraph (rather than only to subparagraph (A), an argument we rejected above), the council nevertheless may not utilize more than one of those three subparagraphs in analyzing a particular ASC because the three subparagraphs are related by the conjunction "or." Petitioners are correct, in part.

The structure of ORS 469.504(1)(b), setting out subparagraphs (A), (B), and (C) and connecting them with the word "or," suggests that they are *alternative* means by which the council may determine compliance with planning goals. Petitioners' arguments reinforce that reading of paragraph (1)(b). They argue that those subparagraphs are mutually exclusive and that nothing in the text of section (5) or the introductory words of section (1) or paragraph (1)(b) suggests that the council may determine that a facility complies with applicable land use rules by "picking and choosing" from among the different criteria and methods described in subparagraphs (A), (B), and (C). Additionally, petitioners argue that each subparagraph expresses a complete thought as to an alternative route by which the council may determine compliance with land use requirements. Subparagraph (A) allows the council to find a facility in compliance with statewide planning goals by determining that the facility complies with applicable substantive criteria from the local government's comprehensive plan and land use regulations. Under that subparagraph, the council is *not* required to consider whether the facility complies with the statewide land use planning goals themselves or exceptions to those goals.[9] Subparagraph (B) provides that, if the proposed facility does *not*

---

[9] ORS 469.504(1)(b)(A) does require the council to find that the facility complies with LCDC administrative rules and goals and any land use statutes that are "directly applicable to the facility under ORS 197.646(3)."

comply with the applicable substantive criteria, the council may determine that it either complies with statewide planning goals or warrants an exception to those goals. Subparagraph (C) makes no mention of the applicable substantive criteria and authorizes the council to "elect" to evaluate a facility by determining whether it complies with the statewide planning goals or, if not, whether exceptions to those goals are justified.

For those reasons, we agree with petitioners that, under ORS 469.504(1)(b) and (5), the council may choose to determine compliance with statewide planning goals by evaluating a facility under subparagraph (A) *or* (B) *or* (C), but that it may not combine elements or methods from more than one subparagraph, except to the extent that the chosen subparagraph itself permits. The council thus erred in interpreting paragraph (1)(b) to permit it to determine compliance with the applicable substantive criteria under subparagraph (1)(b)(A), and then, as to aspects of the facility that did not comply with those criteria, to evaluate them under subparagraph (1)(b)(B).

■ That, however, does not end our inquiry. As we noted above in examining the council's option to review a facility under subparagraph (B), that provision, unlike subparagraphs (A) and (C), refers *both* to "applicable substantive criteria" *and* to "statewide planning goals." Specifically, subparagraph (B) provides that the council may find that a proposed facility meets the requirements of ORS 469.504 it if determines "that the proposed facility does not comply with one or more of the applicable substantive criteria but does otherwise comply with the applicable statewide planning goals" or that an exception to those goals is justified. Because subparagraph (B) permits the council to review for compliance with statewide planning goals only if it first determines that the proposed facility does not comply with the applicable substantive criteria—the local standards—that subparagraph necessarily contemplates the same review that the council undertook here. In its 393-page order, the council evaluated the ASC under the applicable substantive criteria and, when it determined that the proposed facility did not comply with one or more of those criteria, it determined whether the proposed facility nonetheless complied with the statewide planning goals or an exception to those goals. Thus, the council's

review was substantially the same as the review that ORS 469.504(1)(b)(B) contemplated.[10]

Our legal analysis differs from the council's because, as discussed above, we have concluded that the council may not evaluate a proposed facility under both subparagraph (A) and subparagraph (B). However, because subparagraph (B) necessarily requires an evaluation of the same applicable substantive criteria as subparagraph (A)[11] and, to the extent those criteria are not met, directs the council to consider statewide planning goals, we conclude that the council's review of the proposed facility met ORS 469.504's requirements.

That conclusion is consistent with the legislature's intention, apparent from the text and structure of ORS 469.504 as outlined above, to permit the council to review proposed energy facilities for compliance with both local land use regulations and statewide planning goals. The statewide planning goals are umbrella regulations establishing state policy in land use planning. ORS 197.225 - 197.250. State agencies, special districts, and local governments all are subject to the goals; local government plans and implementing regulations must comply with the goals. *Id.*; *Perkins v. City of Rajneeshpuram*, 300 Or 1, 10, 706 P2d 949 (1985) (describing certification of local comprehensive plans); *see also Land Use* § 1.7 (OSB CLE 1994 & Supp 2000). In short, the statewide land use planning goals establish broad policy objectives, while the "applicable substantive criteria" provide specific ways of implementing those objectives through local regulation. Because the local criteria often are more specific than the goals, an ASC may fail to meet the local criteria but still meet the goals. ORS 469.504(1)(b)(B) allows a comprehensive

---

[10] The council may conduct its review under ORS 469.504(1)(b)(B) only if the facility is one "that must be evaluated against the applicable substantive criteria pursuant to subsection (5)." Petitioners do not argue that the proposed facility does not meet this requirement. In any event, ORS 469.504(5) authorized the council, if the special advisory group failed to recommend any criteria, to "determine and apply the applicable substantive criteria"; once that determination was made, the facility was one that "must" be evaluated against the applicable substantive criteria. We conclude that ORS 469.504(1)(b)(B) was an appropriate mechanism for reviewing the proposed facility.

[11] As discussed earlier, the term "applicable substantive criteria" has the same meaning throughout ORS 469.504. *See* 339 Or at 364 n 7.

inquiry that requires the council to determine compliance with the most specific criteria that it can: local "applicable substantive criteria" where possible; findings of compliance with the statewide planning goals in the alternative; and exceptions to the goals if necessary. That scheme is consistent with the overall land use planning structure in Oregon.

## III. EXCEPTIONS TO LAND USE PLANNING GOALS

Petitioners also argue that the council erred in its application of the criteria for taking exceptions to statewide land use planning goals under ORS 469.504(2). As noted, if the council finds that the ASC does not meet statewide planning goals, it still may approve the ASC by "tak[ing] an exception" to the applicable goal under the criteria described in ORS 469.504(2). That statute provides:

"(2)   The council may find goal compliance for a facility that does not otherwise comply with one or more statewide planning goals by taking an exception to the applicable goal. Notwithstanding the requirements of ORS 197.732,[12] the statewide planning goal pertaining to the exception process or any rules of the Land Conservation and Development Commission pertaining to an exception process goal, the council may take an exception to a goal if the council finds [that]:

"* * * * *

"(c)   The following standards are met:

"(A)   Reasons justify why the state policy embodied in the applicable goal should not apply;

"(B)   The significant environmental, economic, social and energy consequences anticipated as a result of the proposed facility have been identified and adverse impacts will be mitigated in accordance with rules of the council applicable to the siting of the proposed facility; and

"(C)   The proposed facility is compatible with other adjacent uses or will be made compatible through measures designed to reduce adverse impacts."

---

[12] ORS 197.732 describes exceptions to the statewide planning goals that a local government may take.

Petitioners argue that the council erred in taking exceptions to Statewide Planning Goals 3 and 4.

A. *Exceptions to Goal 3*

Goal 3 provides that "[a]gricultural lands shall be preserved and maintained for farm use, consistent with existing and future needs for agricultural products, forest and open space and with the state's agricultural land use policy expressed in ORS 215.243 and 215.700." Klamath County Land Development Code § 54.030M implements that goal, providing that a commercial energy facility may use a maximum of 12 acres of high-value farmland or 20 acres of non-high-value farmland before a goal exception is required.[13] The proposed facility would use 50.6 acres of land zoned for exclusive farm use. Because the facility did not meet either the local regulation or the applicable statewide planning goal, the council could approve the ASC only by taking an exception to Goal 3. The final order evaluated the evidence in the record and made findings. Based on those findings, which we summarize below, the council concluded that the proposed facility met the three requirements for an exception that are set out in ORS 469.504(2)(c).

Petitioners object that the council committed legal error by failing to include an "alternatives analysis" to review other possible sites that would not require a goal exception. In addition, petitioners object that the council's findings regarding the requirements of ORS 469.504(2)(c) are not supported by substantial evidence in the record.

1. *Alternatives Analysis*

Petitioners first argue that the council's analysis in taking an exception to Goal 3 was flawed because the council did not require the applicant to provide reasons why the proposed site was better suited than any other site. Petitioners assert that the council's order "ignores the myriad of possibilities of alternative locations consistent with the statewide planning goals." Respondents counter that petitioners seek

---

[13] Some of the proposed site rests on high-value farmland and some on non-high-value farmland. That distinction did not influence the council's analysis because the 50.6-acre proposed site exceeded the maximum acreage for both types of farmland.

an "alternatives analysis" for the proposed facility that the statutes do not require when the *council*, rather than a *local government*, takes an exception to a land use planning goal.

We agree with respondents. ORS 469.504(2)(c), quoted above, sets out the requirements that must be met for the council to take an exception to a land use planning goal. That statute has distinct similarities to ORS 197.732(1)(c), which was enacted 14 years earlier and which sets out the requirements for a local government to take an exception. However, the two statutes also have important differences, which we think are dispositive here. ORS 197.732, the statute relating to exceptions taken by local governments, provides, in part:

"(1)    A local government may adopt an exception to a goal if:

"* * * * *

"(c)    The following standards are met:

"(A)    Reasons justify why the state policy embodied in the applicable goals should not apply;

"(B)    Areas which do not require a new exception cannot reasonably accommodate the use;

"(C)    The long term environmental, economic, social and energy consequences resulting from the use at the proposed site with measures designed to reduce adverse impacts *are not significantly more adverse than would typically result from the same proposal being located in areas requiring a goal exception other than the proposed site*; and

"(D)    The proposed uses are compatible with other adjacent uses or will be so rendered through measures designed to reduce adverse impacts."

(Emphasis added.) The emphasized text highlights one significant difference between ORS 197.732(1)(c) and ORS 469.504(2)(c): The former requires what the parties describe as an "alternatives analysis," *i.e.*, a finding that the "environmental, economic, social and energy consequences" of using the proposed site are "not significantly more adverse" than those that would result from using an alternative site in an area requiring a goal exception.

In construing the text of a statute, we consider "other provisions of the same statute and other related statutes." *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993). In this case, a comparison of the two statutes makes clear that the legislature used ORS 197.732(1)(c) as the basis for the later-enacted ORS 469.504(2)(c) but omitted the requirement of an alternatives analysis. We therefore conclude that the legislature did not intend to require the council to perform an alternatives analysis in making a determination under ORS 469.504(2)(c) that an exception could be taken to a land use planning goal. Contrary to petitioners' argument, ORS 460.504(2)(c) does not require the council to compare an applicant's proposed site with other potential sites, and the council did not err in failing to do so.

### 2. *Findings Regarding Exceptions to Goal 3*

Petitioners also claim that substantial evidence does not support the council's findings under ORS 469.504(2)(c)(A). The council found that the proposed facility required 50.6 acres. It further found that COB would construct the proposed facility at the confluence of three unique and essential resources (a stable groundwater well, an existing natural gas pipeline, and an existing electric transmission line and substation); that the proposed facility would support the existing electrical transmission system, which is "in critical need of more capacity"; that it would benefit the local economy through employment opportunities and contributions to the local tax base; and that it would conserve farmland over the long run by concentrating electrical generation facilities into one larger compact facility rather than several smaller facilities that would occupy more total acreage. Based on those findings, the council determined that "reasons justified" the siting of the 50.6-acre facility on land zoned EFU.

Petitioners challenge the council's findings, asserting that the fact that there are alternative sites on industrial, not EFU, land, shows that the proposed site is not unique. Petitioners also argue that the site is not unique because the change from water to air cooling meant that the facility no longer required large amounts of water.

We review any challenged factual findings of the council for substantial evidence in the record. ORS 183.482(7); *Friends of Parrett Mountain*, 336 Or at 96. Substantial evidence in the record exists "when the record, viewed as a whole, would permit a reasonable person to make that finding." ORS 183.482(8)(c).

We have reviewed the evidence in the record regarding Goal 3 exceptions, and we conclude that substantial evidence in the record supports the challenged factual findings. Although the change from water to air cooling appreciably diminished the proposed facility's need for water, the record shows that the amount of water used was not the only concern that led COB to request a water permit to use the deep underground wells at the proposed site. The evidence showed that that water supply is unique because it taps into an aquifer at a deeper level than other local water uses, providing the facility with an unusually stable water supply without affecting the supply to other local water users. The evidence also showed that the proximity of the site to an existing natural gas pipeline and to the major north-south electricity transmission line on the West Coast (as well as a substation on that line) made the site particularly suited for a gas-powered electricity generation facility. Other evidence showed that the facility needed a site of 50.6 acres. Each of the council's findings regarding the Goal 3 exceptions is supported by substantial evidence in the record.[14]

3. *Findings Regarding Significant Consequences of the Proposed Facility*

Petitioners next challenge the council's factual findings that, pursuant to ORS 469.504(2)(c)(B), substantial evidence in the record demonstrates that the plans for the proposed facility and COB's construction and operation of the facility will "mitigate" the adverse impacts of "significant environmental, economic, social and energy consequences" that may result from the facility. In the contested case proceeding, petitioners described numerous adverse impacts

---

[14] As noted above, and contrary to petitioners' argument here, ORS 469.504(2)(c)(A) does not require an alternatives analysis. Therefore, the council did not have to find that the proposed site was the only workable site or even the best site; it only had to find that reasons justified the use of that site.

that they asserted would follow from "significant environmental, economic, social and energy consequences" of approving the ASC. COB presented testimony of expert and lay witnesses either that those consequences were insignificant or that COB's undertakings (as set out in the ASC) would mitigate them.

In its final order, the council noted that it found that "for each specific type of alleged adverse impact identified by [petitioners], the applicant has identified * * * evidence that shows that the impact is not significant or has shown how the impact will be avoided or mitigated." The council reviewed the evidence, noting, for example, that the ASC proposed to mitigate the potential environmental impacts of the proposed facility by redesigning it to use less water and to change the handling of wastewater to reduce environmental impact, by creating plans for the disposal of waste, and by complying with air emissions standards. The council found that COB proposed to mitigate the facility's effects on deer winter range by restoring and improving deer habitat, that the facility would have a positive economic impact because it would create jobs and provide significant income for the county, and that, although the proposed facility would displace a small amount of farming, it would increase the aggregate income of the surrounding farms through easement purchases. Finally, the council found that the proposed facility would have positive energy impacts because it would use existing resources while helping to meet the region's increasing energy needs. Based on those findings, the council determined that the ASC mitigated or avoided any "significant environmental, economic, social and energy consequences" that the proposed facility posed.

Petitioners argue that the council's findings are unsupported by substantial evidence in the record, contending that the council simply accepted "the applicant's characterization of the issue and its reference to its own evidence" rather than making independent findings. That description of the council's action is inaccurate. Although the council did refer to COB's brief in its final order, it did so to identify the brief's references to the record. The council, as described above, made findings of fact that COB had identified the significant consequences anticipated as a result of the proposed

facility and that the adverse impacts of those results would be mitigated by measures described in the ASC and in the final order. We have reviewed the record, and we conclude that substantial evidence in that record supported each of the council's findings of fact required under ORS 469.504(2)(c)(B).

### 4. *Findings Regarding Compatibility with Other Uses*

Finally, petitioners argue that the council's findings regarding ORS 469.504(2)(c)(C) are unsupported by substantial evidence. That subparagraph requires the council to evaluate the ASC to determine whether "[t]he proposed facility is compatible with other adjacent uses or will be made compatible through measures designed to reduce adverse impacts." Based on evidence in the record and the council's findings of fact in accordance with that evidence, the council determined that the proposed facility was or could be made compatible with other adjacent uses, that the location is remote, that the site is in an already-existing utility corridor, and that the topography of the area segregates the site from other nearby uses. The council also included in the final order a requirement that COB take certain mitigation measures to ensure that the facility would cause minimal disturbance to its neighbors. Having examined the record, we are satisfied that substantial evidence in the record supports the council's findings of fact in this respect and that the council therefore did not err in concluding, based on those findings, that the facility is compatible with other adjacent uses.

### B. *Exceptions to Goal 4*

Petitioners contend that the council erred in allowing an exception to Goal 4, pursuant to which the state endeavors to conserve forestlands. The proposed facility would involve the construction, on land zoned for forest use, of a 100-foot-wide transmission-line corridor, a zone of vegetative maintenance 54 feet on each side of the corridor, and roads to allow access to the transmission lines and vegetative maintenance zone.

No exception was required for the first two uses: Klamath County LDC § 55.040P allows a 100-foot-wide transmission line corridor as a permissive use, and ORS

772.210 allows a vegetative maintenance zone of up to 100 feet on either side of such a corridor. The access roads required an exception, however, because they did not fall within either of those permissive uses. The council determined that the roads did not meet Goal 4, reviewed the goal exceptions criteria of ORS 469.504(2)(c), and took an exception to Goal 4 for the access roads.[15] It based that exception on the following findings: that "reasons justif[ied]" the exception because the use is locationally dependent, the corridor width is dictated by engineering and safety concerns, and the facility would further efficient development and economic growth; that COB would mitigate the environmental consequences posed to seasonal creeks, cultural resources, bald eagle nesting locations, and deer winter range; and that the roads would be compatible with adjacent land uses because they would not alter the forest-regulated land use pattern or the landscape significantly. We have reviewed the record and conclude that substantial evidence supports those findings.

As to petitioners' argument that the council's reasons for taking an exception to Goal 4 are legally insufficient because the council failed to consider alternative locations for the proposed facility, we hold that ORS 496.504(2)(c) does not require an alternatives analysis in these circumstances, for the reasons we discussed above.

## IV. REQUEST FOR RULEMAKING

■ Petitioners argue that the council erred by approving the final order without conducting rulemaking proceedings to clarify the meaning of specific terms used in ORS 469.504, including "notwithstanding," "significant," and "mitigated." Petitioners contend that, because the council failed to adopt rules clarifying those terms, the parties to the contested case proceeding had no notice of how the council intended to apply ORS 469.504. The council, in its final order, declined the

---

[15] Petitioners also argue that the council should have taken an exception to Goal 4 because, under LDC § 55.040I and OAR 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(4)(j), the transmission lines could not exceed a total of 10 acres without an exception. We disagree. Those provisions, which impose a limit on "power generation facilit[ies]," do not apply here because the transmission lines, vegetative maintenance zone, and access roads are not "power generation facilit[ies]." The power generation facility itself is not located on forestlands.

request for rulemaking, stating that "additional rulemaking is neither required nor warranted in this instance" and that "the existing rules are adequate to allow full and fair adjudication of the issues in this case."

As a preliminary matter, we note that petitioners cannot directly challenge the council's denial of their request for rulemaking in this proceeding. This case is before us on direct review from the council's final order approving the ASC. That review is limited to "review of the council's approval or rejection of an application for a site certificate or amended site certificate." ORS 469.404(3). Nevertheless, to the extent that petitioners argue that the absence of rules renders the final order invalid, we properly may consider that argument. In doing so, however, we limit our review to determining whether the council properly approved the ASC when it had not promulgated rules clarifying ORS 469.504.

Petitioners base their argument in part on several statutes that require the council to adopt standards and rules. ORS 469.470(2) provides that the council "shall * * * adopt standards and rules to perform the functions vested by law in the council including the adoption of standards and rules for the siting of energy facilities pursuant to ORS 469.501[.]" ORS 469.501(1) in turn provides that the council "*shall* adopt standards for the siting, construction, operation and retirement of facilities" and that the "standards *may* address but need not be limited to" those regarding "[c]ompliance with the statewide planning goals adopted by the Land Conservation and Development Commission as specified by ORS 469.503." (Emphasis added.)

"Notwithstanding," "significant," and "mitigated," as used in ORS 469.504, are terms used to define "compliance with the statewide planning goals as specified by ORS 469.503." The use of the words "may address" in ORS 469.501(1) demonstrates that the legislature intended the council to have discretion to determine whether to create standards—rule-based or otherwise—to define those terms. At most, ORS 469.501(1) requires the council to adopt some standards addressing the "siting, construction, operation and retirement of facilities." The council already has adopted rules in those categories. *See* OAR ch 345 div 22 (setting out

standards). In our view, the text of ORS 469.501 does not require the council to undertake additional rulemaking. ORS 469.470(2), requiring the council to adopt standards and rules, adds nothing to petitioners' argument; that statute is simply a general requirement that the council adopt rules and standards regarding its operations and regulatory authority, and the council has done so.

Neither does this court's decision in *Marbet v. Portland Gen. Elect.*, 277 Or 447, 561 P2d 154 (1977), on which petitioners rely, require the council to adopt rules. In *Marbet*, this court addressed whether the council had failed to "[e]stablish standards and promulgate rules that applicants for site certificates must meet," as required by an older version of the energy facility siting statute.[16] *Id.* at 458. *Marbet* distinguished between statutes that required the adoption of "standards promulgated *as* rules" and those that provided for the adoption of standards *or* rules. *Id.* at 459. This court determined that, in the former case, the council must adopt formal rules; in the latter, the statute required the council either to adopt formal rules or to articulate standards in the course of contested case proceedings. *Id.* at 459-60. The court held that

> "[i]t is not indispensable that every standard [under those statutes] have been adopted in the form of a rule before the initiation of a contested case, as long as it is in fact adopted as a standard, upon notice and procedures that allow for the presentation of views and data on the issues involved, and sufficiently in advance of the final decision so that the applicant and other parties can address the import of the standard for the particular project. * * * We do not prescribe one specific procedure. Where the act does not itself prescribe that standards must be rules * * *, the choice of

---

[16] *Marbet* addressed two statutes in particular: *former* ORS 469.470, which provided, in part, that the council shall "[e]stablish standards and promulgate rules that applicants for site certificates must meet including, but not limited to, standards of financial ability and qualifications as to ability to construct and operate the energy facility to which the site certificate applies and prescribe the form[,]" and *former* ORS 469.510, which required the council to "set standards and promulgate rules for safety, construction and operation of thermal plants and nuclear installation[s.]" *Marbet*, 277 Or at 458-59.

procedure is left to the council to make, * * * as long as the purposes we have stated are met."

*Id.* at 463-64. *Marbet* thus holds that where a statute requires an agency to choose either to promulgate rules or to articulate standards, it need not always promulgate a rule. In either case, however, the agency must provide notice of the standard and allow the parties to comment on it.

The council correctly stated in its final order that the holding in *Marbet* does not assist petitioner here because, as described above, neither ORS 469.501(1) nor ORS 469.470(2) require the council to adopt rules to clarify the terms used to define "compliance with the statewide planning goals" in ORS 469.504.

In the present case, the council gave petitioners notice of the standards that the council intended to apply and ample opportunity to comment on them. The council described the methods that it would use to evaluate goal compliance or goal exceptions in the proposed draft order, the draft order, and the hearing officer's recommended order—all well in advance of the final order. At each stage of the proceedings, the council provided notice and a hearing, and it accepted comments. In addition, the council conducted a contested case proceeding in which petitioners and COB, with knowledge of the council's proposed standards as articulated in the previous preliminary orders, introduced evidence and presented lengthy oral and written legal arguments. All the versions of what was to become the final order did more than simply state the standards that the council intended to apply. They also showed how those standards would be applied with sufficient specificity to provide the participants with informed notice and to enable them to make meaningful comments, and the successive draft orders evolved in response to those comments. In sum, we conclude that the council did not err in issuing the final order without conducting rulemaking proceedings and that the council's procedures in this case gave petitioners adequate notice of how the council was proposing to apply the relevant statutes.

## V. FINDINGS REGARDING CONDITIONAL USE CRITERIA UNDER KLAMATH COUNTY LAND DEVELOPMENT CODE

■   Petitioners argue that substantial evidence does not support the council's findings that form the basis for its determination that the ASC met the conditional use criteria of Klamath County LDC § 44.030C and LDC § 54.040C. LDC § 44.030C provides that conditional uses may be approved if "[t]he location, size, design, and operating characteristics of the proposed use will not have a significant adverse impact on the livability, value or appropriate development of abutting properties and the surrounding area." LDC § 54.040C provides that conditional uses are approvable if "[t]he location, size, design, and operating characteristics of the proposed use will not force a significant change in, or significantly increase the cost of, accepted farm or forestry practices on nearby agricultural or forest lands."

The council heard testimony from COB's agricultural and soils expert that, although construction of the facility would cause some adverse impacts to the soil, COB's proposed mitigation plan would avoid, minimize, and mitigate impacts to soil and existing agricultural practices. COB's appraiser and land use consultant testified that the proposed facility would not devalue surrounding properties, that the majority of those properties were agricultural and contained no residences, that "few homes are situated within the project vicinity," and that only two homesites would have a view of the facility. The consultant also testified that COB's purchase of surrounding lands provided a "massive acreage buffer" between the proposed facility and adjacent sites. The Water Resources Department reviewed the proposed facility's use of water and recommended that the council find that that use would not injure or interfere with existing agricultural uses of water. Petitioners, on the other hand, presented the testimony of a land use consultant who, based on testimony from several of the petitioners, concluded that the proposed facility would reduce property values and compromise the rural lifestyles of neighboring property owners.

Based on that evidence, the council determined that "[t]he location, size, design and operating characteristics of

the proposed use will not force a significant change in, or significantly increase the cost of, accepted farm or forestry practices on nearby agricultural or forest lands." The council further determined that the same testimony supported a finding that those characteristics "will not have a significant adverse impact on the livability, value or appropriate development of abutting properties and the surrounding area." Evidence in the record, which we have summarized above, supported the council's findings of fact. The council did not err in concluding, based on findings of fact that it made, that the ASC met the conditional use criteria of Klamath County LDC § 44.030C and LDC § 54.040C.

## VI. SITING OF UTILITY FACILITIES ON EXCLUSIVE FARM USE LAND

■    As described earlier, the ASC contained proposals for an energy generation facility, wastewater management areas,[17] a natural gas pipeline, an electrical transmission line, and a water supply system. Petitioners contend that the council erred in approving the construction of these ancillary facilities in an area zoned for exclusive farm use (EFU) because the council misconstrued the requirements of ORS 215.283 and ORS 215.296.

ORS 215.283 provides, in part:

"(1)    The following uses may be established in any area zoned for exclusive farm use:

"* * * * *

"(d)    *Utility facilities necessary for public service, including wetland waste treatment systems* but not including commercial facilities for the purpose of generating electrical power for public use by sale or transmission towers over 200 feet in height. *A utility facility necessary for public service may be established as provided in ORS 215.275.*

"* * * * *

"(y)    Subject to [certain other provisions,] the land application of reclaimed water, agricultural or industrial

---

[17] The council noted that COB was unsure whether it would need the wastewater management areas, but it considered several alternatives for disposing of wastewater and allowed their construction if necessary.

process water or biosolids for agricultural, horticultural or silvicultural production, or for irrigation in connection with a use allowed in an exclusive farm use zone under this chapter.

"* * * * *

"(2) *The following nonfarm uses may be established,* subject to the approval of the governing body or its designee *in any area zoned for exclusive farm use subject to ORS 215.296*:

"* * * * *

"(g) *Commercial utility facilities for the purpose of generating power for public use by sale.*"

(Emphasis added.)

As shown above, ORS 215.283(1)(d) provides that "utility facilities necessary for public service" are permitted in an EFU-zoned area and refers to ORS 215.275 to determine whether a utility facility is necessary for public service.[18] ORS 215.283(2)(g) provides that a "commercial utility facilit[y] for the purpose of generating power for public use by sale" may be sited in an EFU-zoned area, subject to ORS 215.296. That statute, in turn, provides that a use under ORS 215.283(2) is approvable when it will not "[f]orce a significant change in accepted farm or forest practices" on EFU or forestlands or "[s]ignificantly increase the cost" of those practices.

---

[18] ORS 215.275 provides:

"(1) A utility facility established under ORS * * * 215.283(1)(d) is necessary for public service if the facility must be sited in an exclusive farm use zone in order to provide the service.

"(2) To demonstrate that a utility facility is necessary, an applicant for approval under ORS 215.213(1)(d) or 215.283(1)(d) must show that reasonable alternatives have been considered and that the facility must be sited in an exclusive farm use zone due to one or more of the following factors:

"(a) Technical and engineering feasibility;

"(b) The proposed facility is locationally dependent. A utility facility is locationally dependent if it must cross land in one or more areas zoned for exclusive farm use in order to achieve a reasonably direct route or to meet unique geographical needs that cannot be satisfied on other lands;

"(c) Lack of available urban and nonresource lands;

"(d) Availability of existing rights of way;

"(e) Public health and safety; and

"(f) Other requirements of state or federal agencies."

In enacting ORS 215.283, "the legislature intended that the uses delineated in ORS 215.283(1) be uses 'as of right,' which may not be subjected to additional local criteria," while "a county may enact and apply legislative criteria of its own that supplement those [uses] found in * * * ORS 215.283(2)." *Brentmar v. Jackson County*, 321 Or 481, 496, 900 P2d 1030 (1995).

The council reviewed the generation portion of the energy facility as a conditional use under ORS 215.283(2)(g), the wastewater management areas under ORS 215.283(1)(y), and the other ancillary uses as uses as of right under ORS 215.283(1)(d). Petitioners contend that the council erred in analyzing the ancillary uses as uses as of right. Instead, petitioners argue that the ancillary uses are *both* "commercial utility facilities for the purpose of generating power for public use by sale" (ORS 215.283(2)(g)) *and* "utility facilities necessary for public service" (ORS 215.283(1)(d)) and that, consequently, the council should have reviewed those uses for compliance with both ORS 215.296 and ORS 215.275.[19]

Petitioners' interpretation is inconsistent with the text of those statutes. As noted above, ORS 215.283(1)(d) expressly *excludes* from the application of that provision "commercial [utility] facilities for the purpose of generating electrical power for public use by sale," while ORS 215.283(2)(g) expressly *applies* to "[c]ommerical utility facilities for the purpose of generating power for public use by sale." Therefore, the *generating* portion of the facility, at least, may not be subject to both provisions. In addition, this court's decision in *Brentmar* reviewed ORS 215.283 and determined that the legislature intended to allow uses covered by ORS 215.283(1) as of right and to subject uses covered by ORS 215.283(2) to conditional use criteria. That decision supports the conclusion that subsections (1) and (2) are mutually exclusive.

As noted, the council determined that the ancillary facilities were "utility facilities necessary for public service,"

---

[19] Petitioners' arguments are not entirely consistent. Elsewhere, they contend that the entire facility, including the ancillary facilities, should be subject to conditional use criteria under ORS 215.283(2)(g). We address that contention in our discussion below.

while the energy generation portion of the project was a "commercial utility facilit[y] for the purpose of generating power for public use by sale." The council based that determination on its interpretation of the legislative history of ORS 215.283. That interpretation was summarized in the advice that an assistant attorney general provided to the council and which the council quoted and expressly relied on in its final order:

"It really gets to the history of the development of the statutes governing non-farm uses on farm land. When those statutes were first adopted, there were five categories of non-farm use that were allowed on farm land. One of those five categories was utility facilities necessary for public service. So at the very outset in the farm use laws of Oregon we had this provision allowing utility facilities on farm land[.] Then, about 10 years later, the legislature amended—made the first of many subsequent amendments to those statutes, and * * * one of the things they did was divide up the utility facility category [and] create[ ] two subcategories. One was for power plants, they made that a conditional use[.] * * * We believe what that history shows is general [legislative] intent * * * to use [ORS] 215.283(1)(d) as what I would call a general category for utility facilities, and then they've created a number of specific subcategories for particular types of utility facilities. * * * [P]ower plants go in the [paragraph] (2)(g) box, but because the [ancillary facilities] originally would have been in the [paragraph] (1)(d) box, they stay there. So that's the basic advice we've given to the [c]ouncil over the years."

We agree with the council that the statutes distinguish between a commercial facility "for purposes of generating power," which is a conditional use under ORS 215.283(2)(g), and related nongeneration "[u]tility services necessary for public service," which are uses of right under ORS 215.283(1)(d). We further conclude that the council's findings of fact, on which it based its determination that the facility met the conditional use criteria of ORS 215.283(2)(g), are supported by substantial evidence in the record. The council did not err in interpreting and applying those statutes here.

## VII. GEOLOGIC AND SEISMIC STANDARDS

■ OAR 345-022-0020 requires the applicant for a site certificate to "adequately characterize[ ]" the proposed site as to seismic and geological hazards and to show that it can "design, engineer, and construct" the facility to withstand those hazards.[20] To aid applicants in complying with that rule, the council instructs them to submit "[i]nformation from reasonably available sources regarding the geological and soil stability of the site and vicinity[.]" OAR 345-021-0010(1)(h). Both petitioners and COB presented expert testimony on those issues. COB's expert discussed the geotechnical exploration that applicant had undertaken and described his modeling of "worst case scenario" seismic activity at the proposed site. He testified that COB had completed all geological research necessary to determine whether the proposed site was "generally suitable for safe development of a power plant," but that additional research would be necessary before constructing the facility. Petitioners' expert testified that COB should have performed further geologic exploration and that COB's models estimated the magnitude of a possible seismic event too conservatively.

The council found that COB had submitted all the information that OAR 345-021-0010(1)(h) required and that the preponderance of evidence in the record showed that COB had complied with OAR 345-022-0020 by adequately characterizing the site and showing that it could "design, engineer and construct the facility to avoid dangers to human safety." Although the council found that the level of analysis was sufficient to comply with OAR 345-022-0020, it also imposed conditions in the site certificate that required COB to conduct further study.[21]

---

[20] The council implemented that standard under its statutory power to adopt "rules for the siting of energy facilities pursuant to ORS 469.501." ORS 469.470(2).

[21] The council also imposed a condition in the site certificate requiring COB to "design, engineer and construct the facility to avoid dangers to human safety." Petitioners characterize that condition as a way of allowing COB to comply with the requirements of OAR 345-022-0020 retroactively, after the issuance of the site certificate. We disagree. OAR 345-022-0020 requires applicants to show that they "*can* design, engineer, and construct the facility to avoid dangers to human safety" (emphasis added); the council's condition requires the applicant to follow through by designing, engineering, and constructing the facility to meet that standard.

■ On review, petitioners argue that the council erred in finding that COB had characterized the site adequately. We reject that argument because we find that substantial evidence in the record supported the council's determination. "In making [a] determination [of substantial evidence], the probative weight to be accorded the testimony of expert witnesses is for the trier of fact to apportion." *Friends of Parrett Mountain*, 336 Or at 105. When reviewing agency findings to determine whether they are supported by substantial evidence in the record, this court defers to the factfinder's determination of the probative weight to be accorded the testimony of expert witnesses. *Id.* Petitioners' argument, in brief, is that the council credited COB's expert rather than their own. That decision was the council's and provides no basis for this court to reverse the council's conclusion that the applicant met the required geological and seismic requirements.

## VIII. WATER RIGHTS

■ Finally, petitioners challenge the council's decision to direct the Water Resources Commission to issue a water permit to COB. The council may grant an application for water rights if it determines that the proposed use will "ensure the preservation of the public welfare, safety and health." ORS 537.621(2). That statute also creates a rebuttable presumption that a proposed water permit *will* ensure the preservation of the public welfare, safety and health when four conditions are met: (1) the proposed use is allowed under the "basin program" established under ORS 536.300 and ORS 536.340 or given a preference under ORS 536.310, (2) water is available, (3) the proposed use will not injure other water rights, and (4) the use complies with rules of the Water Resources Commission. *Id.* Petitioners challenge only the council's finding that the proposed use will not injure other water rights.

COB proposed to use water from an existing well that draws groundwater from a deeper level than any of the surrounding wells. Although COB asserted that there was no underground connection between the deep well and the shallow wells, hydrogeological testing suggested that there was some connection between the two. However, there also was

expert testimony that the limited connection was unlikely to have any measurable impact on existing water rights.

The council determined that the water permit that COB requested would not injure other water rights. Its basis for that determination was twofold. First, the council found that the evidence presented showed that any impact on surrounding water users would be extremely small. Second, the council imposed conditions on the permit requiring COB to monitor the impact of its deep well on the surrounding shallow wells and to modify or cease its water use if monitoring revealed any measurable impact. The council considered petitioners' objections and evidence that showed that the permit, even as conditioned, could injure existing water rights. However, it determined that the evidence showing that existing water rights would not be injured was more persuasive. As we indicated in our previous discussion, when there is conflicting evidence in the record, the council has authority to determine which evidence to credit. Here, the council's determination that existing water rights would not be injured was supported by substantial evidence in the record.[22]

## XIV. CONCLUSION

We have considered each of petitioners' assignments of error. We conclude that the council's analysis of the procedure for evaluating the proposed facility's compliance with statewide planning goals under ORS 469.504 was incorrect in part, but that the council nevertheless correctly determined that the proposed facility complied with that statute. We further conclude that the council did not commit other legal error and that its challenged findings of fact are supported by substantial evidence in the record.

The order of the Energy Facility Siting Council is affirmed.

---

[22] We have discussed petitioners' primary arguments in detail. We also have considered petitioners' other challenges to findings of fact made by the council and petitioners' other arguments that the council committed legal error. Those other arguments are not well taken, and we do not discuss them further.